Irving B. **GRUBER**, Appellant,

v.

**OWENS–ILLINOIS INC.,** Appellee.

No. 89–3520.

United States Court of Appeals,
Third Circuit.

Argued Dec. 14, 1989.
Decided April 10, 1990.

---

Foster S. Goldman, Jr. (argued), Michael Yablonski, Klett Lieber Rooney & Schorling, Pittsburgh, Pa., for appellant.

James D. Morton (argued), Anthony J. Guida Jr., Buchanan Ingersoll, Professional Corp., Pittsburgh, Pa., for appellee.

Before STAPLETON, GREENBERG and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge:

The question we must answer on this appeal is: does Pennsylvania permit the enforcement of an otherwise valid business brokerage contract which results in the sale of all the stock of a corporation, a part of whose assets consist of land, where the broker is not a licensed real estate broker? Our answer to that question is that such a contract may be enforced. Thus, we reverse the district court's judgment in favor of the defendant-appellee Owens–Illinois and remand the case to the district court for further proceedings.

This action by the plaintiff-appellant Gruber invokes our diversity jurisdiction. Because we sit here in diversity, we are guided by Pennsylvania law in an area where the Supreme Court of Pennsylvania has not yet spoken. We are called upon to predict the position the high court of Pennsylvania would take if this matter were before it.

### I.

Irving Gruber is a business finder-broker—someone who brings together purchasers and sellers of businesses. In March 1986 Gruber and Owens–Illinois entered into a written contract by which Gruber was employed to find a purchaser of Owens–Illinois's wholly-owned subsidiary, Smith Glass Co. ("Smith Glass"), a Pennsylvania corporation. The agreement employed Gruber "on a non-exclusive basis, to find a purchaser for the *stock or assets*" of Smith Glass (emphasis added). Upon the completion of a sale, which ultimately took the form of a sale of stock only, Gruber, if the sale or transfer was indeed made "directly or indirectly to or through" a prospect he provided, would receive a commission. Calculated on the basis of the price ultimately paid by the buyers of Smith Glass's stock, that commission would amount to approximately $125,000.

Gruber did find a potential buyer for Smith Glass, Mortek Technical Services, Ltd. Gruber introduced the principals of the two corporations to each other; facilitated meetings; conducted a tour of the plant for Mortek representatives; arranged for Mortek to be provided with financial statements, asset appraisals, and the like. Through its officers, including one Nicholas Hrkman, Mortek in late July of 1986 submitted a letter of intent to purchase Smith Glass. Mortek was, however, unable to obtain the necessary financing, and it was compelled to terminate its letter of intent shortly thereafter.

Following the failure of Mortek's financing efforts, Hrkman advised a client for whom he had rendered accounting services in a capacity unrelated to his functions at Mortek, that Smith Glass was available for

purchase. That client, Michael Carlow, evinced substantial interest in the company. Hrkman, in turn, supplied Carlow with Mortek's business and marketing plans— produced in the context of Mortek's previously contemplated purchase of Smith Glass. Carlow's interest grew, and toward the end of October 1986 Hrkman accompanied Carlow on a tour of the Smith Glass plant. Shortly thereafter, Carlow purchased all of the stock of the company. In acquiring 100% of Smith Glass's stock, of course, Carlow obtained control over all of Smith Glass's assets, including all its real estate, i.e., its plant.

Owens–Illinois refused to pay Gruber the agreed-upon commission fee to which Gruber claimed to be entitled. Owens–Illinois contended that Gruber did not in fact broker the sale that ultimately took place and that, since the assets transferred in the sale included real estate but Gruber is not a registered licensed real estate broker, Gruber was barred by Pennsylvania law from attempting to collect any commission that might be due him.

## II.

Gruber thereupon commenced an action against Owens–Illinois in state court, which Owens–Illinois removed to the district court for the Western District of Pennsylvania. 28 U.S.C. § 1441. Both parties stipulated to the facts material to the summary judgment motion by Owens–Illinois that we review here.[1] The district court granted summary judgment to Owens–Illinois, holding that the Pennsylvania Real Estate Licensing and Registration Act, 63 P.S. § 455.201 and § 455.302 (Purdon 1988) (the "Licensing Act") precluded Gruber from enforcing his agreement for a commission. We hold that under Pennsylvania law, as we believe it would be construed by the Supreme Court of Pennsylvania, the

district court erred in granting summary judgment to Owens–Illinois. Thus, we hold that the Pennsylvania Supreme Court, interpreting the Real Estate Licensing and Registration Act, would find that the Act poses no bar to Gruber's recovery should it otherwise be merited.

## III.

The Pennsylvania Real Estate Licensing and Registration Act, 63 P.S. § 455.101 *et seq.* (Purdon 1988), in the interests of the consuming public,[2] bars all actions to recover commissions brought by unlicensed real estate brokers. Section 455.302 reads:

> No action or suit shall be instituted, nor recovery be had, in any court of this Commonwealth by any person or compensation for any act done or service rendered, the doing or rendering of which is prohibited under the provisions of this act by a person other than a licensed broker, salesperson, limited broker, limited salesperson, builder-owner salesperson or rental listing referral agent, unless such person was duly licensed and registered hereunder as broker or salesperson at the time of offering to perform any such act or service or procuring any promise or contract for the payment of compensation for any such contemplated act or service.

The statute, § 455.201 defines "broker" as one who:

> (1) negotiates with or aids any person in locating or obtaining for purchase, lease or acquisition of interest in any real estate;
>
> (2) negotiates the listing, sale, purchase, exchange, lease, time share and similarly designated interests, financing or option for any real estate;
>
> (3) manages or appraises any real estate;

---

**1.** Our standard of review is plenary in regard to the district court's grant of summary judgment. *Solomon v. Klein,* 770 F.2d 352, 353 (3d Cir. 1985). Likewise, our standard of review is plenary when reviewing a district court's interpretation of applicable state contract law. In the determination of whether there is any genuine issue of material fact to try, the substantive law

will identify which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Chippollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.1987) (in banc).

**2.** *See infra,* 1373 and n. 9.

(4) represents himself as a real estate consultant, counsellor, house finder;

(5) undertakes to promote the sale, exchange, purchase or rental of real estate: provided, however, that this provision shall not include any person whose main business is that of advertising, promotion or public relations or

(6) attempts to perform any of the above acts.

As previously noted, the question before us is simply whether these statutes should be read to exclude Gruber from bringing suit for his commission and recovering.

■ The intermediate Pennsylvania courts have addressed the statutes before us in contexts somewhat similar to the context of this case, but the Pennsylvania Supreme Court has not. In interpreting state statutes, decisions of the state's highest court are binding upon us. *Commissioner of Internal Revenue v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967). In explaining *Bosch's* significance for lower state court rulings, however, this court has prescribed the effect of inferior court determinations in ascertaining the state law in question:

"We are not precluded from giving 'proper regard' to the holdings of the lower courts of the forum state in fashioning a conflict-of-laws rule, although, unlike the holdings of the state's highest court, they are not necessarily dispositive of the question." (citing cases). [Precedent of this court] thus counsels that state intermediate appellate decisions are not automatically controlling. The Supreme Court in *Bosch* summarized current practice in diversity cases as follows:

"[E]ven in diversity cases this Court has further held that while the decrees of 'lower state courts' should be 'attributed some weight ... the decision [is] not controlling ...' where the highest

court of the State has not spoken on the point...."

\*    \*    \*    \*    \*    \*

We conclude, therefore, that while we may not ignore the decision of an intermediate appellate court, we are free to reach a contrary result if, by analyzing "other persuasive data," we predict that the [State] Supreme Court would hold otherwise.

*National Surety Corporation v. Midland Bank*, 551 F.2d 21, 29–30 (3d Cir.1977) (Garth, J.) (citing and quoting *Paoletto v. Beech Aircraft Corp.*, 464 F.2d 976, 979 (3d Cir.1972) and *Bosch*, 387 U.S. at 465, 87 S.Ct. at 1782) (footnotes omitted).[3]

## IV.

To what sources—in the words of *National Surety* and *Bosch* to what "other persuasive data"—do we turn then when a state's highest court has not decided a particular issue? In answering this question, we have found the suggestions of the Sixth Circuit helpful and in accord with our own decision in *National Surety*. It has held that:

If the forum state's highest court has not addressed the issue, the federal court must ascertain from all available data, including the decisional law of the state's lower courts, restatements of law, law review commentaries, and decisions from other jurisdictions on the "majority" rule, what the state's highest court would decide if faced with the issue.

*Grantham and Mann, Inc. v. American Safety Products, Inc.*, 831 F.2d 596, 608 (6th Cir.1987).

■ To predict the response which we believe the Pennsylvania Supreme Court would give to the question before us, we examine: (1) what the Pennsylvania Supreme Court has said in related areas; (2) the "decisional law" of the Pennsylvania

**3.** *See also, Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1167 (3d Cir.1981); *Goodwin v. Elkins & Co.*, 730 F.2d 99, 110 n. 23 (3d Cir.1984); *Connecticut Mutual Life Insurance Co. v. Wyman*, 718 F.2d 63, 65–66 (3d Cir.1983); *O'Donnell v. Yanchulis*, 875 F.2d 1059, 1063 (3d Cir.1989); *Plummer v. Lederle*

*Laboratories*, 819 F.2d 349, 355 (2d Cir.1987); *Green v. J.C. Penney Auto Ins. Co.*, 806 F.2d 759, 761 (7th Cir.1986) ("Intermediate [state] appellate court cases are useful but not binding evidence of what the [state] Supreme Court would do").

intermediate courts; (3) federal appeals and district court cases interpreting the state law; (4) decisions from other jurisdictions that have discussed the issue we face here.

### A.

■ As we have stated, the Pennsylvania Supreme Court has not yet spoken directly to the issue presented in this case.[4] The proper starting point for ascertaining what it would hold in such a circumstance is, therefore, its interpretation of closely relevant corporation law.[5] Here the teaching of the Pennsylvania Supreme Court has been clear and forceful. The state high court has for many years distinguished between a corporation's *stock* and its *property*. "Under Pennsylvania law, one's ownership of a corporation's entire stock does not constitute him owner of the corporation's property." *Borough of Homestead v. Defense Plant Corp.*, 52 A.2d 581, 587, 356 Pa. 500 (1947). *Accord, Barium Steel Corp. v. Wiley*, 108 A.2d 336, 379 Pa. 38 (1954); *McKenna v. Art Pearl Works, Inc.*, 310 A.2d 677, 680, 225 Pa.Super. 362 (1973); *see also, Viso v. Werner*, 369 A.2d 1185, 1188, 471 Pa. 42 (1977).

This distinction between *stock* and *assets* is well established in Pennsylvania. Since 1900 and without alteration in any respect relevant here, Pennsylvania's highest court has held firm to its original distinction and its significance:

> ... the principle is well established that the shares of the capital stock of a corporation are essentially distinct and different from the corporate property, and that the owner of all the stock of a corporation does not own the corporate property.... 'The shares of a corporation constitute a species of property entirely distinct from the corporate property; a shareholder has no distinct and individual title to the moneys or property of the corporation.... The shares represent a right to participate in the profits only.'

*Monongahela Bridge Co. v. Pittsburgh & B. Traction Co.*, 46 A. 99, 101, 196 Pa. 25 (1900) (quoting *Bidwell v. Railway Co.*, 6 A. 733, 114 Pa. 541 (1886)). This distinction is predicated neither on the number of shareholders, the size of the corporation, or the nature of its assets. *Viso v. Werner*, 369 A.2d 1185, 1188, 471 Pa. 42 (1977).

Simply on the basis of the stock/asset distinction alone, one might reasonably conclude that the sale of Smith Glass's stock falls outside the ambit of the Pennsylvania Real Estate Licensing and Registration Act.

### B.

We turn next to an analysis of the applicable "decisional law of the state's lower courts." *Grantham*, 831 F.2d at 608. Owens–Illinois contends that the intermediate courts of Pennsylvania have adopted holdings that, taken together, would bar Gruber from attempting recovery of any commission. We disagree and find significant differences between those cases and the case before us.

Intermediate Pennsylvania courts have addressed some of the issues presented by the parties here (though not in the same context), and those cases have used language that, at first blush, could be misunderstood as supporting the argument made

---

**4.** In *Heymann v. Electric Service Mfg. Co. Inc.*, 194 A.2d 429, 430–33, 412 Pa. 338 (1963) Heymann claimed a broker's commission for having procured a purchaser for all of the capital stock of the Electric Service Manufacturing Co. An issue discussed by the Supreme Court of Pennsylvania in reversing the trial court's judgment in favor of Electric Service was whether the seller company had authorized the sale of just its plant for $600,000 or the stock of the entire company for $3 million. Because the trial court's charge limited jury consideration only to the sale of Electric Service's plant, the Pennsylvania Supreme Court ordered a new trial. Apparently, no specific issue was raised as to whether the sale of stock, where real estate was included among the company's assets, would implicate the Pennsylvania Real Estate Licensing and Registration Act.

**5.** For this court, sitting in diversity and charged with ascertaining what the state Supreme Court would do, the opinion of the state Supreme Court on matters closely related but not identical to the one we are currently considering is more helpful than more closely related opinions by lower state courts.

by Owens–Illinois. Thus, for example, Owens–Illinois places considerable emphasis on the case of *Burke v. Israel,* 399 A.2d 779, 264 Pa.Super. 286 (1979) and its progenitor case *Burns v. Gartzman,* 11 A.2d 708, 139 Pa.Super. 453 (1940). Owens–Illinois claims that these cases require us to hold that any single transaction involving the sale of real property, as part of or along with the sale of a business or other personalty, automatically invokes the coverage of the Act, thereby disqualifying any unlicensed broker from attempting to recover a commission.

We read these cases differently. *Burke,* for example, clearly involved an agreement with a broker to sell coal interests owned by an estate. The agreement provided for a certain commission for the sale of "the coal interests" and/or "the sale of the property," namely a leasehold (with option to purchase) on the real estate on which the coal was to be found. 399 A.2d at 780, 782. The broker in *Burke* claimed that, although he did actually sell real estate without a license, he should nevertheless receive a commission "because the transaction was a single, isolated transaction, with respect to which he did not hold himself out as a 'real estate broker....'" *Id.,* at 781. It was these arguments—exemption for "isolated transactions" and the "absence of misrepresentation"—that the court rejected. The Pennsylvania Superior Court held that the sale of the coal was part of the same transaction as the lease of the real estate, and because Burke was claiming a commission on the sale of the real estate (10% of $8 million), the Licensing Act barred his action and recovery.

In holding as it did—that neither "isolated transactions," "good faith," nor "quantum meruit" claims could overcome the Li-

censing Act's exceptions proscriptions—*Burke* followed the ruling of the then forty year old case of *Burns v. Gartzman,* 11 A.2d 708, 139 Pa.Super. 453 (1940). In *Burns,* a real estate broker unlicensed in Pennsylvania contracted with the owner of a Philadelphia bakery:

> to procure a purchaser for the bakery business and the real estate, or a purchaser for the bakery who would lease the real estate for a term of not less than fifteen years.

11 A.2d, at 709.[6]

The *Burns* court held that notwithstanding that this transaction in Pennsylvania by a licensed New York realtor was, for the broker, an "isolated" event, the licensure requirements of the Act had to be met because the transaction constituted a sale of assets of which real estate was a part. Thus, we cannot read *Burns* as leading to the conclusion that *any* sale of a business, including a sale of corporate stock in which a real estate interest is implicated, requires compliance with the provisions of the Licensing Act. Neither *Burke* nor *Burns* involved a stock sale and each of those cases held no more than that the sale of assets including real estate must meet the requirements specified by the Pennsylvania Real Estate Licensing and Registration Act.

### C.

We turn next to our court cases and the district court cases interpreting the Pennsylvania law. While we would be bound to follow this court's earlier interpretations of the Pennsylvania Licensing Act if they addressed and decided the issue before us,[7] no federal court decision has interpreted the Pennsylvania Real Estate Licensing and Registration Act in a context like the

---

**6.** The alleged agreement on which Burns sought to collect called for a payment of $15,000 ($8,000 in cash) for the business and between $275 and $300 per month as "a lease of the real estate for a term of fifteen years." *Burns v. Gartzman,* 11 A.2d 708, 711, 139 Pa.Super. 453 (1940).

**7.** This court has held that, absent compelling distinctions, where one panel has interpreted a state statute, a subsequent panel may not reject

that interpretation on the grounds that it believes the prior decision to be incorrect. *Ciba–Geigy Corp. v. Bolar Pharmaceutical Co. Inc.,* 747 F.2d 844, 856 n. 10 (3d Cir.1984). We noted there:

> As a panel of this court, we are obligated to follow a prior panel's construction of [state] law and as a panel we cannot reject those views simply because we think the prior case may have been wrongly decided.

instant case. Examining our court's rulings, we find nothing in our cases that is contrary to our prediction as to how the Pennsylvania Supreme Court would interpret the Licensing Act in the present context.

Both parties agree that the only relevant Court of Appeals case is that of *Schultz v. Palmer Welloct Tool Corp.*, 207 F.2d 652 (3d Cir.1953). This court in *Schultz* held that the "trend of the Pennsylvania decisions" in the intermediate courts of the state was such as to deny the possibility of relief to the plaintiff business broker, Schultz. 207 F.2d at 653. The court in *Schultz* focused on the "trend" of intermediate state court decisions where the "real estate part of [the sale] is purely incidental" and where the broker was involved in what was, for him, an "isolated transaction." 207 F.2d at 653–54. Whether or not the transaction involved was an "isolated" transaction, and whether or not real estate was a primary component of the transaction, what is significant about *Schultz* is that it represented no more than a sale of *assets* that included realty. Schultz had in fact claimed to find a buyer for the total *assets* of the corporation in question.

Although the *Schultz* court was struck by the possible inequity of barring recovery altogether where the "land was valued at about $9,000 while the asking price for the enterprise as a going concern was to be $355,000," *id.*, it found a business broker ineligible for his commission where even a part of the assets sold consisted of real estate. This court adopted the finding of the district court that the contract in question provided for the sale of all the *assets* of the business and that the "plaintiff testified that he knew he was selling the real estate of the defendant company as part of its business." *Schultz v. Palmer Welloct Tool Corp.*, 115 F.Supp. 939, 940 (D.W.D. Pa.1953).

Indeed, the district court in *Schultz* had construed the "deed of conveyance" for the

corporate assets as more than incidentally including real estate. It reasoned that, viewed as a totality including immovable "machinery and equipment essential to the manufacturing process," the real estate component represented over half the total assets of the company and was not so insignificant as the net value of the land itself might suggest. 115 F.Supp. at 940.[8]

Thus, the rule of *Schultz* is no more than an acknowledgment that the intermediate Pennsylvania state courts tend to enforce the licensing requirement where real estate as such, or assets including real estate, are the subject of a transaction. Hence, one who brokers such a transaction may not collect a commission unless he holds a Pennsylvania broker's license. *Schultz* thus simply says nothing about a brokered sale of corporate *stock*.

There have, however, been two district court cases that do address the import of the Real Estate Licensing and Registration Act's licensing requirement in the context of a sale of stock. In the more recent of these, *Wayne A. Vandenburg Enterprises, Inc. v. Park Drive Manor, Inc.*, 678 F.Supp. 515, 516 (ED Pa.1987) a finder/broker who had brought together seller and buyer sought to sue for his commission. Through the broker, the defendant had "purchased the stock of Park Drive Manor, Inc." *Id.* The court held that, because he was unlicensed, the broker could not sue to recover. The court reasoned that:

> the purchase of the apartments, although accomplished by a sale of the stock of Park Drive Manor, Inc., was the 'purchase ... of [an] interest in ... real estate.' Under the Act, where the parties intend a transfer of real estate, the form of the transaction is immaterial.

*Id.* at 516 (quoting the Act).

In light of our holding, that a sale of corporate stock where the corporation's assets include real estate lies outside the ambit of the Licensing Act, we express no

---

**8.** The district court used the following valuations: seven or eight acres of land valued at $9,000, a building at $104,000, and "the equipment contained therein" at $118,000, for a total of $231,000 as real estate broadly construed while the "company books disclosed total assets of $423,000." *Id.* Thus, by the district court's calculation, real estate encompassed about 55% of the proposed transaction.

prediction as to whether the Supreme Court of Pennsylvania would reach the same result reached by *Vandenburg* and for the same reasons. We have only cited *Vandenburg* because it is one of the few cases that has construed the Licensing Act; but we are not unaware of the fact that it emerges from a district court effort to interpret state law. Thus, we express no opinion as to what our prediction would be in the situation—which we do not face or address here—where, in a commercial transaction, the *entire* stock interest of a real estate corporation is brokered by a non-licensed broker. As indicated *infra,* we believe that the Licensing Act was enacted to effect different objectives.

The only other district court case analyzing the Pennsylvania statute recognized that the sale of stock of a corporation differs substantially from the sale of the underlying assets of the corporation. *Schoettle v. Sarkes Tarzian, Inc.,* 191 F.Supp. 768, 771 (ED Pa.1961). *Schoettle* involved an "ultra vires" contract to sell the assets or stock of a closely-held corporation negotiated between a broker and the president of the corporation. *Schoettle* followed *Schultz* and rejected as irrelevant the broker's argument that real estate was "only a small part" of or incidental to the transaction on which he sought to recover. *Id.* The *Schoettle* court found that the brokerage contract in question could only have legally functioned as a contract for "a sale of the assets [of] the corporate defendant" because the corporation's president, who negotiated the brokerage contract, was not authorized to sell the stock of the corporation. Because the assets of the corporation included land and buildings of at least $2.2 million, the court denied Schoettle's commissions under the Licensing Act.

In doing so, *Schoettle* recognized the key—*and ultimately determinative*—sub-stantive difference between the sale of corporate stock and the sale of corporate assets. Hence, *Schoettle* concluded that

> ... even though the Pennsylvania [Real Estate] Brokers Act would not apply to an action for the sale of *stock*, it would be a bar to an action for commissions for finding a buyer for the corporate *assets* which include real estate.

191 F.Supp., at 771 (footnote omitted) (emphasis added).

This is precisely the distinction that Gruber urges upon us and which was acknowledged by the district court's statement that

> Shares of the capital stock of a corporation are essentially distinct and different from the corporate property. Ownership of the stock does not constitute one owner of the corporation property.

191 F.Supp. at 771, n. 11 (citations omitted).

**D.**

■ Our conclusion that the Pennsylvania Real Estate Licensing and Registration Act would not bar Gruber's commission also finds support in other areas. The Pennsylvania legislature's intent in passing the Act was simple and abundantly clear. The goal of the Act was emphasized in its legislative history. The legislators indisputably expressed the design and goal of the act to be the exclusion of unscrupulous, incompetent, untrained, and insolvent tradesmen from the real estate trade. The regulatory scheme in general, including the denial of commissions to unlicensed brokers in particular, can be viewed as the legislators' commitment to preventing brokers and their employees from gouging, exploiting, and abusing ordinary consumers: the buyers and sellers of homes, condominia, and the like.[9]

In our perception, the evils that the Act were designed to thwart can have little

---

9. *See,* 163 Legis.Jrnl.Comm. of Pa. 2642–44, 2649–55 (1979). (comments by Rep. Wilson on preventing "fraud, misrepresentation, deceit"—at 2643; Rep. Murphy on preventing "rip off artists" and fraud in "Florida [type] land sales ... where people have purchased property and ... might arrive at the site ... and find there are no roads, no sewerage, no water"—at 2649; Rep. Dorr on ensuring that all employees of real estate agencies representing themselves as agents or brokers be licensed—at 2652; Rep. Earley urging that the legislation ban realtor discrimination against minorities and the handicapped—at 2655). The same purposes animated the predecessor act, 63 P.S. 431 *et seq.* (Purdon 1968) enacted in 1929. *See,* Comment, *Pennsylvania Real Estate Licensing Act of 1980,* 54 Temple L.Q. 806, 810–12 (1981).

application to commercial transactions that involve the sale of stock of an entire enterprise, even though the company's assets may include some real estate. Commercial transactions such as the one at issue here would be distorted if the corporate form of sale were ignored, particularly when it is recognized that the title and ownership of whatever real estate may be involved in the sale remains within the corporate body, under the corporate name, and never changes hands. We are satisfied that the Supreme Court of Pennsylvania would hold, as we do here, that the licensure requirements of the Pennsylvania statute do not apply to the sale of an entire stock interest—a situation in which both the buyer and the seller are technically far more sophisticated than the average homebuyer for whose primary protection the Licensing Act was passed.

In so concluding, we take note of a case decided by the Supreme Judicial Court of Massachusetts in 1988, which in its discussion, based on Massachusetts legislation, stated:

> We accept that the sellers would have owed the full commission of 10 percent, based on written commission agreements, if corporate stock (and not assets) had been sold.

*Turnpike Motors, Inc. v. Newbury Group, Inc.*, 528 N.E.2d 1176, 1177, 403 Mass. 291 (1988). We recognize, of course, that *Turnpike Motors* concerned the sale of assets and not corporate stock, although the broker in that case alleged that the sale was to be of corporate stock rather than assets. We also recognize that the Massachusetts statutes differ somewhat in content from Pennsylvania's Licensing Act. The discussion, however, in *Turnpike Motors* bears out our holding here that significant differences exist between the sale of a corporation's stock and the sale of its assets. That difference was expressed by the *Turnpike Motors* court as:

> [the statute's] restriction on an unlicensed broker's right to recover a com-

mission on the sale of real estate is inapplicable to an unlicensed business broker's claim for a commission on the sale of stock in a corporation owning an interest in land (as almost all operating corporations must).... [We take the law] to make clear that *for the purposes of obtaining a commission the sale of any or all of the stock in a corporation is not a sale of an interest in land.*

*Id.* at 1179 (emphasis added).

We find further support for this view in the jurisprudence of a neighboring state to Pennsylvania. In *Kazmer–Standish Consultants, Inc. v. Schoeffel Instruments Corp.*, 445 A.2d 1149, 89 N.J. 286 (1982) the Supreme Court of New Jersey interpreted New Jersey's licensing statutes to permit a broker's commission where a sale of assets included real estate. In doing so, the court stated:

> A business broker is one who, for a fee or commission, negotiates the transfer or sale of an ongoing business. Although the sale of a business frequently includes valuable real estate, the business broker concentrates on the transfer of the entire business. The transfer of the business can assume many forms, *e.g.*, a sale of assets, including real estate, or the transfer of stock. The transaction may also take many forms, such as a merger, consolidation, acquisition, or divestiture, and the purchase price may be paid in cash, other assets, securities, or other consideration.
>
> Neither the words nor the history of the real estate brokers' act indicates that the act was intended to protect businessmen from business brokers.

*Kazmer–Standish*, 445 A.2d at 1151. Significantly, the court rejected an earlier precedent, *Kenney v. Paterson Milk & Cream Co., Inc.*, 164 A. 274, 110 N.J.L. 141 (E & A 1933), because *Kenney* had failed to recognize that real estate licensing acts were intended to protect consumers in the residential housing market and not businessmen.[10]

---

**10.** Following *Kazmer–Standish*, in New Jersey business brokers responsible for the sale of a business's *assets* may now collect their fees or commissions on that portion of the brokered sale not consisting of real estate. *Id.*

We acknowledge, of course, that under the Pennsylvania Licensing Act a Pennsylvania intermediate court confronted with a broker's action for commission where a sale of *assets* including real estate had taken place, would, in all likelihood, hold that the broker's commission, contrary to the New Jersey doctrine of *Kazmer–Standish*, would in Pennsylvania be barred. *Burke v. Israel*, 399 A.2d 779, 264 Pa.Super. 286 (1979); *Burns v. Gartzman*, 11 A.2d 708, 139 Pa.Super. 453 (1940). Thus, while we predict that the Pennsylvania Supreme Court would sustain our interpretation of Pennsylvania law insofar as it is limited to a *stock* sale, we do not imply that the sale of *assets*, even where the entire business is sold, falls within the same doctrine. *See, Schultz v. Palmer Welloct Tool Corp.*, 207 F.2d 652 (3d Cir. 1953). That issue, of course, is not before us.

Finally, while we do not hinge our determination on the effect that a contrary holding would have on a corporation which owned real estate in more than one state, we can envision numerous difficulties that would be encountered in the brokering of corporate sales of stock where the selling company owned real estate in several different states, each of which had different licensing acts.

### V.

As we observed at the outset, our task has been to predict what the Pennsylvania Supreme Court would hold in a case such as this one where the entire stock of Smith Glass was sold by Owens–Illinois, and, included among Smith Glass's assets, was real estate. We are satisfied that the Pennsylvania Supreme Court, in reviewing the sources of authority and persuasive data that we have examined, would construe the Pennsylvania Licensing Act as having no application to a sale of corporate stock even where the assets of the corporation included real estate.

We will therefore reverse the judgment entered in favor of Owens–Illinois under date of June 30, 1989 and will remand this case to the district court for further pro-

ceedings. We, of course, take no position on the merits of Gruber's claim other than to hold that his claim for commissions is not barred by Pennsylvania's Real Estate Licensing and Registration Act, 63 P.S. § 455.