515 A.2d 948

Cheryl C. PIERCE

v.

W. Robert PENMAN, M.D. and Dorothy I. Lansing, M.D., Appellants.

Superior Court of Pennsylvania.

Argued March 4, 1986.

Filed Sept. 29, 1986.

226

228

Hugh Hutchinson, Philadelphia, for appellants.

George A. Brutscher, Kennett Square, for appellee.

Before McEWEN, BECK and JOHNSON, JJ.

JOHNSON, Judge:

In this case we consider whether a patient, with a history of emotional problems known to her physicians, may recover compensatory and punitive damages from those physicians for severe emotional distress suffered when the physicians repeatedly refused to turn over to the patient copies of her medical records under circumstances where the physicians conceded that the patient was legally entitled to receive promptly copies of her medical records.

Appellee, Cheryl C. Pierce (hereinafter referred to as "patient" or "Appellee"), filed an equity complaint on January 19, 1981 against Appellants, Robert Penman, M.D. and Dorothy Lansing, M.D. (hereinafter sometimes referred to as "physicians" or "Appellants"), alleging that Appellants refused to provide copies of Mrs. Pierce's medical records to her. The complaint sought copies of the medical records, compensatory damages, punitive damages and attorney's fees. The case was tried non-jury before the Honorable Lawrence E. Wood of the Court of Common Pleas of Chester County in June of 1984.

On September 11, 1984, Judge Wood, in a Decree Nisi, ordered payments by the physicians of the patient's counsel fees, plus $1,000 for compensatory damages and $7,000 for punitive damages. In the Decree Nisi the chancellor found, and on appeal the physicians concede, that copies of the patient's requested medical records should have been promptly turned over to her.[1] Both sides filed exceptions, and on May 9, 1985, a court *en banc* amended the Decree Nisi to increase compensatory damages to $2,500 and increase punitive damages to $10,000, while striking the earlier award of attorney's fees.

Apparently the May 9, 1985 Order was never sent by the trial court to counsel for the physicians, and their counsel never saw the order until June 18, 1985. The physicians' post-trial motion seeking leave to appeal *nunc pro tunc* was granted on July 8, 1985 giving them ten days to file an appeal. On July 17, 1985, the physicians filed a timely appeal to this Court.

On appeal the physicians contend that the trial court abused its discretion:

a) in failing to grant their Motion for Continuance,

b) by awarding compensatory damages for mental anguish and emotional distress,

---

1. Because Appellants do not challenge this finding by the chancellor, we take no position as to whether the physicians were legally required to promptly turn over to the patient copies of her requested medical records.

c) in awarding punitive damages, and

d) by awarding excessive compensatory and punitive damages.

Finding no merit to these contentions, we affirm.

 Before addressing the issues raised by the physicians, we note that the instant appeal was filed more than thirty days after the trial court's May 9, 1985 adjudication. Pennsylvania Rule of Appellate Procedure 903(a) expressly provides that a notice of appeal "shall be filed within 30 days after the entry of the order from which the appeal is taken." However, an extension of the statutory period of time during which an appeal may be taken may be justified where there is fraud or some breakdown in the court's operation. *West Penn Power Company v. Goddard,* 460 Pa. 551, 333 A.2d 909 (1975). We find the trial court properly granted the physicians additional time to appeal, since failure to notify their counsel of the court's adjudication obviously represents a breakdown in the operation of the court.

Turning to the issues raised by the physicians, we first address their contention that the trial court erred in not granting their Motion for Continuance. The power to grant or refuse a request for a continuance is within the discretion of the trial court and will be reversed only where it is clear that the trial court's discretion has been abused. *Phoenix Mutual Life Insurance Co. v. Radcliffe on the Delaware, Inc.,* 439 Pa. 159, 266 A.2d 698 (1970); *Walasavage v. Marinelli,* 334 Pa.Super. 396, 483 A.2d 509 (1984).

 We find no abuse of discretion by the trial court in the instant case. The physician's present counsel, Hugh J. Hutchison, Esquire, who requested a continuance on June 28, 1984, is the fourth attorney to represent Appellants in this case. The trial court, in denying Attorney Hutchison's motion, made specific reference to "prior continuances and change of counsel" (N.T., 6/28/86 at 5; R. at 35a) and went on to indicate that a continuance would have delayed the start of the trial for two months or possibly longer because

of the court's busy schedule. *Id.* Moreover, the physicians' treatment of this issue in their brief cites no specific examples of prejudice incurred by Appellants as a result of the trial court's ruling.

Next, the physicians challenge the trial court's award of compensatory and punitive damages for mental anguish and emotional distress. In *Hoffman v. Memorial Osteopathic Hospital,* 342 Pa.Super. 375, 381, 492 A.2d 1382, 1385–86 (1985) we recently stated:

> Intentional infliction of emotional distress is an actionable wrong in Pennsylvania. *See Papieves v. Lawrence,* 437 Pa. 373, 263 A.2d 118 (1970); *Bartanus v. Lis,* 332 Pa.Super. 48, 480 A.2d 1178 (1984). This actionable wrong is described in Section 46 of the Restatement (Second) of Torts (1965).

The trial court's award of damages in the instant case was based upon Section 46, which states:

### § 46. Outrageous Conduct Causing Severe Emotional Distress

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

(b) to any other person who is present at the time, if such distress results in bodily harm.

Section 46 does not recognize liability for mere negligent infliction of emotional distress. However, reckless conduct causing emotional distress renders an actor as liable as if he had acted intentionally. *See Chuy v. Phila-*

*delphia Eagles Football Club,* 595 F.2d 1265 (3rd Cir.1979); Comment i to Section 46.[2]

 Moreover, the conduct must be of an extreme and outrageous type in order to support an action under Section 46. *See Jones v. Nissenbaum, Rudolph & Seidner,* 244 Pa.Super. 377, 368 A.2d 770 (1976); Comment d to Section 46.[3]

 Our scope of review on appeals from a decree in equity is a limited one. Facts found by the chancellor in a court of equity, when supported by competent evidence in the record, are binding upon an appellate court. *Presbytery of Beaver-Butler v. Middlesex Presbyterian Church,* 507 Pa. 255, 489 A.2d 1317, *cert. denied,* —— U.S. ——, 106 S.Ct. 198, 88 L.Ed.2d 167 (1985). However, the chancellor's conclusions of law are reviewable. *Village Beer and Bev-*

**2.** Comment i reads: *"Intention and recklessness.* The rule stated in this Section applies where the actor desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct. It applies also where he acts recklessly ... in deliberate disregard of a high degree of probability that the emotional distress will follow."

**3.** Comment d reads: *"Extreme and outrageous conduct.* The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'
The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt...."

*erage, Inc. v. Vernon D. Cox and Co., Inc.*, 327 Pa.Super.
99, 475 A.2d 117 (1984).

In the chancellor's September 11, 1984 Adjudication, he
made the following findings of fact:

1. Plaintiff, Cheryl C. Pierce is an adult individual who
 resides at 45 Ivy Road, Rockford Village, Wilming-
 ton, Delaware.

2. Defendants are husband and wife and duly licensed
 physicians specializing in the field of obstetrics and
 gynecology and are associated in business with of-
 fices in West Chester and Paoli, in this County.

3. Starting approximately in 1968 and continuing until
 1977, Defendants rendered various professional ser-
 vices to Plaintiff and generally administered to the
 obstetrical and gynecological care and treatment of
 Plaintiff.

4. In 1977 Plaintiff and her husband moved to Wilming-
 ton, Delaware, and she decided to start going to a
 local Wilmington doctor.

5. She went to see a Dr. Hochman and signed a release
 authorizing him to obtain her medical records from
 Defendants. Dr. Hochman wrote for Plaintiff's
 records but never got any response. He presumably
 made his request to Defendants although he was
 unable to recall on the day of the hearing to whom
 he sent the request and the release and Defendants
 deny receiving them.

6. In 1978 Plaintiff switched to yet another OBGYN,
 Dr. D'Amico. To fill Dr. D'Amico in on her past
 medical history, Plaintiff went to Dr. Hochman to
 get her records. His office informed her that they
 never received them.

7. In Spring of 1979, Plaintiff made an unannounced
 visit at Defendant's Paoli office seeking to obtain
 her records. For some reason, Defendant Lansing
 failed to provide Plaintiff with copies of her records.
 Instead, the meeting deteriorated into a confronta-

tion over Plaintiff's right to have her "records". The visit ended with Dr. Lansing refusing to turn over the records but assuring Plaintiff that they would be made available to any subsequent treating physician through normal channels. Plaintiff was also informed that her records were at the West Chester office.

8. Plaintiff thereupon phoned George Brutscher, Esquire. As a result of that conversation with her lawyer Plaintiff decided that she wasn't entitled to the original records. From that point on she requested only copies of her records from Defendants. She then made an appointment to see Dr. Lansing at her West Chester Office to obtain copies of her records.

9. Plaintiff arrived at Defendant's office at the appointed time, but this visit ended similarly to her first visit in Paoli. Defendants never provided any copies of Plaintiff's records, but only agreed to give specific information from the file to any treating physician who requested it. The visit ended with Dr. Lansing stating that any further communications should come through the parties' attorneys.

10. On June 19, 1979, Plaintiff through her attorney requested that Defendants provide to Plaintiff a true and correct copy of her medical file. In that letter Plaintiff agreed to pay any reasonable costs which Defendants might incur occur [sic] and agreed to any reasonable conditions concerning reproduction and delivery so as not to inconvenience Defendants. Defendants made no response.

11. Plaintiff got her attorney's brother, who is a doctor, to send a written request to Defendants for a copy of her records. Defendants again made no response.

12. From late 1979 until early 1981 there was some communication between the attorneys but no progress was made towards obtaining copies of

Plaintiff's records. We do find, however, that Plaintiff and her attorney made every reasonable effort to avoid any inconvenience or expense to Defendants in making those records available to Plaintiff, and that there is simply no good reason apparent on this record why Defendants did not produce copies of the requested records.

13. Finally, in January 1981, Plaintiff brought this action in Equity seeking a mandatory injunction ordering Defendants to produce her records. Service was accepted by counsel for Defendants on February 4, 1981 but Defendants profess not to have found out about this suit from their attorney until May, 1981. They filed their Answer and New Matter on June 25, 1981.

14. In the meantime, on March 30, 1981, Defendants' Paoli office was burglarized. (Defendants claim that, for some reason not on the record, the records were transferred to the Paoli office.) Defendants now claim that they are willing to produce the requested records at Plaintiff's expense but are unable to because they were allegedly taken during the burglary.

15. Although the police were contacted in connection with the burglary, the Detective in charge of the investigation was never notified that any charts or files were taken.

16. Defendants earn approximately $107,000.00 per year and have a net worth of over $500,000.00.

17. Plaintiff's counsel fees and costs for this suit are $3,534.95.

R. at 4a–8a.

■ Our review of the record satisfies us that the facts as found by the chancellor are supported by competent evidence. Based on the findings, we agree that the physicians have recklessly caused the patient severe emotional distress. The physicians were aware of the patient's history

of emotional problems. In fact, Dr. Penman testified that he actually referred the patient to a psychiatrist for treatment of her emotional problems. N.T., 6/28/84 at 109; R. at 139a. With this knowledge of her emotional problems, the physicians were, or reasonably should have been, substantially certain that their repeated refusal to provide the patient with her medical records over a period of years would cause her severe emotional distress. *See Hoffman v. Memorial Osteopathic Hospital, supra.* While the physicians may not have actually intended to cause the patient severe emotional distress, their reckless actions brought their conduct within the parameters of Section 46.

We now look to the question of whether the patient is entitled to compensatory damages. While the trial court found that Appellee had not suffered any monetary loss, this does not prevent her from recovering compensatory damages since emotional distress alone may result in the recovery of such damages. *Reist v. Manwiller,* 231 Pa.Super. 444, 332 A.2d 518 (1975). We find no error in the trial court's award of compensatory damages.

With respect to punitive damages, we note that in *Kirkbride v. Lisbon Contractors, Inc.,* 357 Pa.Super. 322, 516 A.2d 1 (1986) an en banc panel of our Court recently held "that an award of punitive damages must bear some relationship to the amount awarded as compensatory damages." *Id.,* 357 Pa.Superior Ct. at 328, 516 A.2d at 3. In *Kirkbride* our President Judge, the Honorable Vincent A. Cirillo, set forth the following succinct history of the relationship between punitive damages and compensatory damages in Pennsylvania:

> [S]everal earlier Supreme Court decisions held that the amount of punitive damages must bear a reasonable relationship to the award of compensatory damages. *See Hughes v. Babcock,* 349 Pa. 475, 37 A.2d 551 (1944); *Givens v. W.J. Gilmore Drug Co.,* 337 Pa. 278, 10 A.2d 12 (1940); *Thompson v. Swank,* 317 Pa. 158, 176 A. 211 (1934); and *Mitchell v. Randal,* 288 Pa. 518, 137 A. 171 (1927). These Supreme Court decisions were cited as authority and followed by our Court in *Delahanty v.*

*First Pennsylvania Bank, N.A.,* 318 Pa.Super. 90, 464 A.2d 1243 (1983), and *Feld v. Merriam,* 314 Pa.Super. 414, 461 A.2d 225 (1983), *reversed on other grounds,* 506 Pa. 383, 485 A.2d 742 (1984). They were also discussed in the case of *Daley v. John Wanamaker, Inc.,* 317 Pa.Super. 348, 464 A.2d 355 (1983). To date, none of these cases has been overruled by the supreme court. Rather, their viability has recently been confirmed by a plurality decision of our Commonwealth's highest court in *Martin v. Johns-Manville Corporation,* 508 Pa. 154, 494 A.2d 1088 (1985). In *Martin,* Justice Hutchinson, joined by Justice Flaherty, reiterated that punitive damages must bear a reasonable relationship to actual compensatory damages. Justice McDermott, who filed a concurring opinion, did not take issue with Justice Hutchinson's statement of the law concerning the relationship between punitive and compensatory damages. Justice Papadakos joined Justice McDermott while Chief Justice Nix and Justice Zappala concurred in the result and Justice Larsen did not participate.

*Id.,* 357 Pa.Superior Ct. at 325–326, 516 A.2d at 3.

In the instant case we have concluded that a reasonable relationship exists between the $2,500 awarded in compensatory damages and the $10,000 awarded in punitive damages. As we indicated in *Feld v. Merriam,* 314 Pa.Super. 414, 437, 461 A.2d 225, 237 (1983), "punitive damages cannot be measured by a yardstick. They are not considered to be disproportionate to compensatory damages unless they are greatly in excess of compensatory damages." The finder of fact should be given broad discretion in assessing the amount of punitive damages which will be sufficient to punish the defendant and to set an example which may deter the defendant and others from similar conduct. *Daley v. John Wanamaker, Inc.,* 317 Pa.Super. 348, 464 A.2d 355 (1983). While the punitive damages awarded by the trial court in the instant case may be at the

outer limit of reasonableness,[4] we are not prepared to disturb the trial court's award of punitive damages on grounds that they bear no reasonable relationship to compensatory damages.

Appellants also contend that the patient's claim for medical records were placed in the hands of their attorney and that they took no affirmative action on the request but simply relied in good faith on the advice of counsel. It is argued that this reliance on the advice of counsel serves as a barrier to the award of punitive damages.

The record in the instant case reflects very little about the legal advice that the physicians received from their attorney. Dr. Penman testified that after the matter was turned over to Attorney Fred Cadmus, he asked Mr. Cadmus to get the problem solved as promptly as possible. Dr. Penman indicated that Attorney Cadmus notified him about this instant lawsuit and, at one point, advised that copies of the patient's medical chart should be made to see if the case could be settled. R. at 168a–170a. Cadmus also allegedly told Dr. Penman that the records were withheld for almost two years because the patient's legal counsel was insisting on receiving the original chart. R. at 176a. Dr. Lansing, in her testimony, made no reference to advice which she may have received from Attorney Cadmus and Attorney Cadmus never testified.

The question of whether good faith reliance on advice of legal counsel may insulate a defendant from punitive damages appears to be an issue of first impression in Pennsylvania. The Third Circuit Court of Appeals has recently addressed this particular question in *Stanton By Brooks v. Astra Pharmaceutical Products*, 718 F.2d 553 (3rd Cir.1983) in the following manner:

> Pennsylvania courts do not appear specifically to have addressed the question whether advice of counsel may be raised as a defense (albeit not an absolute one) to a claim

---

**4.** We note that in *Chuy v. Philadelphia Eagles Football Club, supra,* punitive damages six times that of compensatory damages were held not to be excessive.

for punitive damages, but a number of courts have held that "good faith reliance upon advice of counsel may prevent imposition of punitive damages," *Henderson v. United States Fidelity & Guaranty Co.*, 695 F.2d 109, 113 (5th Cir.1983); accord *Fox v. Aced*, 49 Cal.2d 381, 317 P.2d 608, 610–11 (1957); *see also* 22 Am.Jur.2d *Damages* § 253 (1965) (citing cases). We are persuaded by these decisions, and we predict that Pennsylvania law would allow a jury considering punitive damages to take into account [advice received from the defendant's counsel]. Counsel's testimony to that effect thus was properly admitted as relevant to the claim for punitive damages. *Id.* at 580. We agree that good faith reliance on advice of counsel may be raised as a defense to the imposition of punitive damages and, if raised, should be considered by the finder of fact.

■■■ The finder of fact in the instant case, over objection, heard testimony concerning the advice which the physicians received from their legal counsel and concluded, in spite of that testimony, that an award of punitive damages was warranted. Therefore, the chancellor as the finder of fact in the instant case did consider the defense of good faith reliance on advice of counsel. We find no abuse of discretion in the chancellor's conclusion that the advice of counsel defense did not, on these facts, overcome the plaintiff's case.

Appellants' final contention is that the damage awards are excessive. The gravamen of Appellants' argument is that the *en banc* court increased the compensatory and punitive damages in its May 9, 1985 Memorandum Order to compensate for the reversal of that portion of the chancellor's Decree Nisi which awarded attorney's fees. The record does not support this argument.

■■■ Appellee filed exceptions to the Decree Nisi asserting that the damages awarded were not adequate. The court *en banc*, in considering the adequacy of the initial damage awards, heard oral argument, considered briefs, reviewed the record, considered the extent and possible

duration of the patient's mental anguish caused by the physicians, and concluded that $1,000 represented inadequate compensation. In light of the physicians' outrageous conduct and their wealth, the court *en banc* also concluded that the punitive damage award of $7,000 was inadequate. Order, 5/9/85; R. at 14a. The court *en banc* agreed with the patient's exceptions and increased both the compensatory and the punitive damages. Under our limited scope of review, we will not disturb the damages awarded since we find no abuse of discretion by the court *en banc*.

Order affirmed.