Charles T. **ROWE**, Administrator of the Estate of Mildred Glick Friedman, deceased, and Charles T. Rowe, Administrator of the Estate of Mildred Glick Friedman, Trustee Ad Litem, Plaintiff,

v.

Dorothy **MARDER**, Defendant.

Civ. A. No. 90–162 Erie.

United States District Court, W.D. Pennsylvania.

Nov. 15, 1990.

---

Paul J. Malizia, Malizia & Malizia, P.C., Emporium, Pa., Andrew J. Connor, Erie, Pa., for plaintiff.

Herbert Bennett Conner, Judith F. Olson, Dickie McCamey and Chilcote, Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION

MENCER, District Judge.

On August 15, 1988 Mildred Glick Friedman committed suicide. Plaintiff brings this action on behalf of the decedent's estate and the decedent's incompetent daughter, charging that defendant caused Ms. Friedman to take her own life. The case began in the Court of Common Pleas, McKean County, Pennsylvania, where a summons was filed on April 19, 1990. Defendant then removed to this court on the ground of diversity of citizenship. 28 U.S.C. §§ 1331, 1441. Plaintiff, in turn, filed a motion to remand to state court, contending that the removal was untimely. 28 U.S.C. §§ 1446(b), 1447. Defendant has countered with a motion to dismiss the complaint for its failure to state a claim upon which relief can be granted, Fed.R. Civ.P. 12(b)(6). Plaintiff's motion to remand is denied, defendant's motion to dismiss is granted.

### I. MOTION TO REMAND

Before addressing the substantive issues in defendant's motion to dismiss, this court will rule on plaintiff's motion to remand. The essential facts are not in dispute.

At all times pertinent to this action, plaintiff was a resident of Pennsylvania, Defendant, a resident of Maryland, and the amount sought, over $50,000. Thus, this court would have had original jurisdiction based on diversity of citizenship, 28 U.S.C. § 1332, and Defendant would be able to remove to this court upon timely application, 28 U.S.C. § 1441. In addition to a

jurisdictional basis, however, defendant must comply with the statutory notice procedures of 28 U.S.C. § 1446(b). That statute provides in pertinent part:

The notice of removal of a civil action or proceeding shall be filed within thirty days after receipt by defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based. . . .

Here, the Prothonotary for the Court of Common Pleas issued a summons which was served upon the defendant on April 26, 1990. The complaint, however, was not served until June 22, 1990. The petition for removal was filed on July 9, 1990, seventeen days after defendant received the complaint, but over two months since defendants had received the summons. Complicating matters slightly is additional correspondence between the parties, but ultimately the question is whether it was the summons or the complaint that triggered the 30 day period. If the summons was the "initial pleading setting forth the claim for relief" then removal is not timely; if it was the complaint, then all requirements for removal have been met.

Pennsylvania federal courts view this issue in rather inconsistent ways. All agree, however, that in order to satisfy the notice requirement, "a defendant must be able to ascertain easily the necessary facts to support his removal petition." *Craig v. Lake Asbestos of Quebec, Ltd.*, 541 F.Supp. 182, 184 (E.D.Pa.1982); *Nero v. Amtrak*, 714 F.Supp. 753, 755 (E.D.Pa.1989), *Moore v. City of Philadelphia*, No. C.A. 88–1424, slip op., 1988 WL 50382 (E.D.Pa. 5/16/88). To allow a document with less information to satisfy the statute would require the movant to "guess" as to an actions' removability, thus encouraging premature, and often unwarranted, removal requests. *Gottlieb v. Firestone Steel Products Co.*, 524 F.Supp. 1137, 1140 (E.D.Pa.1981).

In the instant action, the form summons stated only that "you are notified that [Charles T. Rowe . . .] plaintiff(s) has commenced a civil action against you which you are required to defend." (Petition for Removal Unnumbered Page 5). Plaintiff does not even make the argument that this satisfied the notice requirement. Rather, Rowe argues that a letter to defendant's attorney dated April 26, 1990 which accompanied the summons triggered the time allotment. (Supplemental Brief in Support of Motion to Remand Exhibit A). The letter provides, in the last paragraph:

After investigation into the matter, an action was filed against Dorothy Marder for the death of Mildred Glick Friedman. It is based upon the tort of intentional or reckless infliction of emotional distress as set out in the Restatement 2nd of Torts § 46 (1965).

Rowe contends that this gave enough notice to defendant to start the time running when the summons was received. Defendant counters that this paragraph did not state the amount sought to be recovered, and thus did not contain enough information to know whether the action was removable.

The issues presented are: 1) whether this court should follow the 'bright-line' rule that regardless of its content a Pennsylvania Summons never triggers the removal period, 2) if not, should the court consider the state of defendant's actual knowledge when determining the sufficiency of notice, 3) should the court allow documents such as the letter, which are outside the summons and complaint, to satisfy the removal statute's notice requirement.

*Craig v. Lake Asbestos of Quebec, Ltd.*, 541 F.Supp. 182 (E.D.Pa.1982), held that a Pennsylvania praecipe for writ of summons together with the summons never satisfies § 1446. In that case, plaintiff's summons and praecipe were "very informative" and "exceeded[ed] dramatically" the "barebones" form such as the one in the case at bar. *Craig*, 541 F.Supp. at 185–86. Nevertheless, the court did not allow the summons to trigger the thirty day period—it rejected any case-by-case analyses of summonses out of concern that such an approach would invite "wasteful litigation." *Craig*, 541 F.Supp. at 185. *Craig*, however, is flatly contrary to the Congressional intent to require the earliest possible removal. See *International Equity Corp. v. Pepper and Tanner Inc.*, 323 F.Supp. 1107,

1109 (E.D.Pa.1970); *Moore,* supra; *Nero,* 714 F.Supp. at 755.

Later cases abandoned the bright line rule of *Craig* but swung far in the opposite direction. Not only did they adopt a summons-by-summons approach, they added a subjective element, evaluating each summons for the notice it provided in light of particular knowledge possessed by the defendant. In *Moore,* for example, the court held that the summons triggered the statute because "[p]laintiff's notice of deposition and the subsequent correspondence between plaintiff's counsel and defense counsel evidence that defendants knew of the incident and the theories and specific causes of action." [1]

This court believes, however, that, by the terms of the statute, the issue is not what the defendant knew, but what the relevant document said. See *Ardison v. Villa,* 248 F.2d 226 (10th Cir.1957); *Universal Motors Group of Companies, Inc. v. Wilkerson,* 674 F.Supp. 1108, 1111–12 (S.D.N.Y.1987). Where the language of a statute is unambiguous, the plain language dictates the meaning. See *Aaron v. SEC,* 446 U.S. 680, 699–700, 100 S.Ct. 1945, 1957–58, 64 L.Ed.2d 611 (1980); *Consumer Products Safety Comm'n v. GTE Sylvania Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1981). Here, the time begins to run upon "receipt by the defendant ... of a copy of the initial pleading setting forth the claim for relief." 28 U.S.C. § 1446(b). The statute focuses on what the document "set[ ] forth" rather than on what a defendant actually learned from its receipt. Thus a defendant could not argue that even though the document was satisfactory, he did not read it. Similarly, it would seem that a plaintiff should not be able to argue that even though the pleading was incomplete, the defendant nevertheless knew that the action was removable.

■ The plaintiff in this case suggests that I consider the letter, mailed along with the summons, in determining whether the statute was satisfied. While *Moore* considered correspondence as relevant for that purpose, this court, having rejected any subjective evaluation, need not inquire of extraneous documents. Instead, the inquiry begins and ends within the four corners of the pleading.[2] The inquiry is succinct: whether the document informs the reader, to a substantial degree of specificity, whether all the elements of federal jurisdiction are present. See *Wilkerson,* at 1112.

*Moore, Nero* and others are guided by a federal policy of strict construction against removal jurisdiction, *Nero,* 714 F.Supp. at 755, and a congressional goal of requiring "the earliest possible removal." *Moore,* supra; *Blow v. Liberty Travel,* 550 F.Supp. 375, 377 n. 2 (E.D.Pa.1982); *Pepper & Tan-*

---

1. *Nero* found that the summons triggered the statute because the defendant, Amtrak, as a federally chartered and federally owned corporation, "is on notice upon receipt of *any* summons that the action against it is removable." *Nero,* 714 F.Supp. at 755. Thus, *Nero* also focused on the subjective state of the defendant's knowledge, although that case can be read as being limited to its rather special facts.

2. Of course, the correspondence in *Moore* and the letter at issue here are not "pleadings." At a minimum, anything considered a pleading must be something of the type filed with a court. Black's Law Dictionary 1312 (4th Ed.1968). *Wilkerson* is not to the contrary. While that case stated that "any document providing sufficient information" will satisfy the statute, all of the documents that case discussed satisfied the definition of pleading. See also *Mtech Corp. v. FDIC,* 729 F.Supp. 1134 (N.D.Tex.1990) (letters of counsel were ordered by the state court and thus were sufficient to trigger the 30 day period under another portion of 1446 which ran from receipt of "pleading ... or other paper").

Having decided not to inquire into defendant's actual knowledge, I need not determine whether the letter at issue would have provided enough information. While the letter did indicate that there was diversity, defendants claim that since no damage amount was alleged, they could not determine if the jurisdictional amount was satisfied. Defendants at bar, however, probably knew with as great a certainty as did Amtrak in *Nero,* that federal jurisdiction would obtain; they probably knew that in a wrongful death case damages claimed would exceed $50,-000. See also *Blow,* 550 F.Supp. at 377 and n. 3 (allegation that plaintiffs were "residents" put defendant "on warning" that plaintiffs were probably citizens, and defendants "need[ed] only [to] establish[ ] that plaintiffs intend to reside permanently").

*ner,* 323 F.Supp. at 1109; see also *Shamrock Oil v. Sheets,* 313 U.S. 100, 61 S.Ct. 868, 85 L.Ed. 1214 (1941). However, the analysis which concerns itself with defendant's actual knowledge, or which requires chasing down notes passed back and forth between attorneys, will ultimately disserve the goal of obtaining earlier removal despite its nominal tether to an earlier deadline. The sound concerns voiced in *Craig* over "wasteful litigation" are magnified by the *Moore* approach, which could lead to protracted periods of uncertainty regarding the proper forum for a given case. By contrast, a summons-by-summons evaluation, if limited to an objective evaluation of the pleadings, will direct cases to the proper forum quickly and accurately.

As noted earlier, the summons in this case is so bare that plaintiffs do not even suggest that it satisfied the statute. Thus, the complaint is the first document to trigger the time allotment, and defendant's removal petition is therefore timely.

## II. MOTION TO DISMISS

On August 15th, 1988, Mildred Glick Friedman jumped from the fifth floor of the Fulton–Hooker building in Bradford, Pennsylvania. Two weeks later she died at Hamot hospital in Erie. Plaintiff, Charles T. Rowe, is the administrator of the decedent's estate and he alleges that decedent's sister, Dorothy Marder, played a significant role in Ms. Friedman's demise. Plaintiff's first cause of action is a survival action pursuant to 42 Pa.C.S. § 8302, based in intentional infliction of emotional distress. As a second cause of action, Rowe seeks to recover in wrongful death (42 Pa. C.S. § 8301 & Pa.R.Civ.P. § 2202), on behalf of Amy Hope Friedman, decedent's retarded daughter. Defendant is now seeking to dismiss both claims pursuant to Fed.R.Civ.P. 12(b)(6).

### 1. Standard for Motions to Dismiss Under Rule 12(b)(6)

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests only the formal sufficiency of the request for relief. In other words, the court determines whether, even if defendant has done all it is accused of doing, the case should nevertheless be dismissed because there is no law against what it has done. Therefore, "factual allegations of the complaint are to be accepted as true and the complaint should be dismissed only if it appears to a certainty that no relief could be granted under any set of facts which could be proved. Reasonable factual inferences will be drawn to aid the pleader." *D.P. Enterprises v. Bucks County Community College,* 725 F.2d 943, 944 (3d Cir.1984); *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Wright & Miller, Federal Practice And Procedure: Civil 2d § 1356–57 (1987 Supp.). Thus, although the facts of this case are disputed, on this 12(b)(6) motion the facts informing my decision are those proffered by the plaintiff.

### 2. Factual Background

The essence of the claim is that decedent was somewhat emotionally unstable and that Ms. Marder knew this, and over many years manipulated Ms. Friedman into reliance on Marder's support and advice to the exclusion of all others'. Then, suddenly, Marder withdrew all support leaving Ms. Friedman broken, despondent and suicidal.

Plaintiff alleges that by exploiting Ms. Friedman's emotional instability, Marder maneuvered herself into a position of dominance over decedent's life. Once there, she directed Ms. Friedman to a birth control clinic over her husband's objection. Marder also told decedent to remove her severely retarded daughter from a specialized institution and care for her at home. Additionally, Marder was co-executrix and co-beneficiary with Ms. Friedman of the estate of their deceased mother Sara. Marder, however, used her dominance over her sister to seize control of the estate and assume the role of sole executrix. Defendant also successfully influenced Ms. Friedman to divorce her husband who had been "the sole provider for herself and [daughter] Amy." (Complaint at 4). Marder then advised decedent in the divorce proceedings, making them unnecessarily protracted. In fact, as a result of Marder's influence on Ms. Friedman, the proceedings lasted seven years and ruined Friedman financially. Marder also promised that if

anything ever happened to incapacitate Ms. Friedman, Marder would personally take care of Ms. Friedman's retarded daughter Amy.

Then, in August 1988, Marder abruptly turned on her sister, ordering that Friedman cease looking to Marder for advice or guidance. Marder went on to say that, contrary to earlier representations, Ms. Friedman would receive only a small portion of the mother's estate. Marder then repudiated her commitment to care for Ms. Friedman's daughter. Marder also instructed decedent not to "take any steps to think about or try to reconcile or conclude her divorce." (complaint at 6). Marder thus left Ms. Friedman without any support or guidance in this troubling affair, even though it was Marder that instigated the divorce in the first instance. Based on her belief in astrology, defendant told her sister not to seek professional help despite Ms. Friedman's earlier talk of suicide. Finally, Marder also advised Ms. Friedman to stop taking the medication which was medically prescribed to her. Less than one month later, Ms. Friedman jumped to her death.

### 3. Legal Discussion

Count one of the complaint is a survival action in which decedent's estate seeks to recover for injuries suffered by the decedent herself. Rowe claims, on behalf of the estate, that defendant's actions amounted to an intentional infliction of emotional distress which ultimately lead to Ms. Friedman's suicide. Count two, wrongful death, claims that by causing decedent's suicide, defendant also worked a separate harm, in the form of the loss of Ms. Friedman's support, on the decedent's daughter. See *Manning v. Capelli,* 270 Pa.Super. 207, 211, 411 A.2d 252, 254 (1979); *Berry v. Titus,* 346 Pa.Super. 376, 499 A.2d 661 (1985). Each count is independent of, and cumulative with, the other. See *Gallick v. United States,* 542 F.Supp. 188, 189–90 (M.D.Pa.1982). Both counts,

however, raise the same primary substantive issues. The first, is whether Ms. Friedman's suicide constituted an independent act such that defendant could not, as a matter of law, be held liable for her death. If defendant could be liable for causing a suicide, the court must next determine whether Pennsylvania recognizes the underlying cause of action alleged to have resulted in suicide—the intentional infliction of emotional distress. Finally, if such a cause of action is recognized, I must determine whether plaintiff has made allegations sufficient to state a claim for relief.[3]

### A. Is Liability for Causing Suicide Barred as a Matter of Law?

■ Pennsylvania has not decided whether a person may be liable for causing another to commit suicide absent a specific duty to prevent suicide. Since the state's highest court has never decided the question, it is my duty, as a federal court sitting in diversity, to anticipate the position of the Supreme Court of Pennsylvania were this issue to come before it. *Gruber v. Owens–Illinois Inc.,* 899 F.2d 1366, 1368 (3d Cir. 1990). I am guided in my effort by any relevant indicator of that position including the "decisional law of the state's lower courts, restatements of the law, law review commentaries, and decisions from other jurisdictions," *Id.* at 1369.

The courts which have addressed the issue uniformly split the claims into two familiar categories: cases where death is caused by intentional wrongdoing and those where causation is negligent. See *Tate v. Canonica,* 180 Cal.App.2d 898, 5 Cal.Rptr. 28 (1960) (discussing the difference between negligence and intentional torts in suicide context), *Fischer v. Morales,* 38 Ohio App.3d 110, 526 N.E.2d 1098 (1987) (negligent), *Mayer v. Town of Hampton,* 127 N.H. 81, 497 A.2d 1206 (1985) (intentional). While there is some

---

**3.** Plaintiff also alleged that defendant's conduct was negligent. The allegation was made merely as a conclusory listing of a fact, however, and not as a separate cause of action or even a separate theory of the one cause of action. Nevertheless, this court notes that Pennsylvania

might allow recovery where there is a particular duty to prevent suicide and a breach of it. *McPeak,* infra, 381 Pa.Super. 227, 553 A.2d at 441. No such duty can be established here, and plaintiff does not attempt, beyond mere conclusory allegations, to do so.

uncertainty with respect to acts of negligence, it is plain that where suicide results from an intentional wrong, "the trend of recent cases is toward allowing recovery." 1 Speiser, Wrongful Death 85 (1975 and 1989 supp.).

Defendant urges that Pennsylvania law is contrary to the emerging trend. Her sole argument is based on *McPeake v. Cannon*, 381 Pa.Super. 227, 553 A.2d 439, 441 (1989), which states that in Pennsylvania, "[g]enerally suicide has not been recognized as a legitimate basis for recovery in wrongful death cases." *Id.* 553 A.2d at 440. In that case, however, defendant was merely negligent. *Id.* 553 A.2d at 441. The rationale of the court was that "suicide constitutes an independent intervening act so extraordinary as not to have been reasonably foreseeable by the original tortfeasor." *Id.* It is hornbook law that liability for intentional torts extends beyond foreseeability for the obvious reason "that it is better for unexpected losses to fall upon the intentional wrongdoer than upon the innocent victim." Prosser & Keeton, The Law of Torts 40 (5th ed. 1984). In fact, Pennsylvania has explicitly employed this reasoning to allow recovery in another area where the link between the act and the injury is often suspect—the intentional infliction of emotional distress. *Bartanus v. Lis*, 332 Pa.Super. 48, 480 A.2d 1178, 1185–86 (1984). Even though it spoke in some broad generalizations which may be read to cover intentional acts, *McPeake* held only that a lawyer's malpractice cannot make him liable for the suicide of his client. It does not abandon the sensible distinction between intentional and negligent actions. Thus, while *McPeake* precludes liability, absent a special duty, for suicide caused by negligent acts, I believe that Pennsylvania would allow some recovery for suicide caused by intentional acts.

Even if the intentional tort is established, however, most courts constrain plaintiffs in suicide cases to meet a greater standard of causation than might otherwise be required. Plaintiffs must prove that the intentional tort was a "substantial factor" in causing the suicide. *Tate*, 5 Cal.Rptr. at 36; *Mayer*, 497 A.2d at 1211. By contrast, those who intentionally injure others can usually be liable for standard remote harms with only a weak causal link. See Restatement (Second) of Torts § 435B and comment a and illustration 1. The difference is that in suicide cases, the final cause of death always appears as an independent act of a separate will, always raising the very real possibility that the suicide was truly unrelated to the defendant's actions. *McPeake*, though expressed in terms of foreseeability, shows that Pennsylvania shares the obvious concerns over the indeterminate nature of causation in suicide cases. Thus, Pennsylvania would, like California and New Hampshire, require the intentional wrong to be a "substantial factor" in causing the suicide. A jury certainly could find that this test has been met here, but I need not inquire any further since plaintiff has failed to articulate any underlying intentional tort.

B.  Intentional Infliction of Emotional Distress

i.  *Existence of a Cause of Action*

The intentional wrong defendant is alleged to have committed is the intentional infliction of emotional distress as set out in Restatement (Second) of Torts § 46. Defendant counters that Pennsylvania does not recognize any such cause of action, and that even if it did, plaintiff has not made out a claim. Section 46 provides:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

Restatement (Second) of Torts § 46 (1965); *Bartanus v. Lis*, 332 Pa.Super. 48, 480 A.2d 1178, 1184 (1984).

Earlier Pennsylvania cases seemed to readily accept section 46 as a legitimate, though undeveloped, cause of action, see e.g., *Papieves v. Kelly*, 437 Pa. 373, 263 A.2d 118 (1970) (based on first restatement), *Banyas v. Lower Bucks Hospital*, 293 Pa.Super. 122, 437 A.2d 1236 (1981), and most later cases dealt with shaping the

contours of the tort, rather than questioning its validity. See *Bartanus,* supra. This consistent development, however, was abruptly unsettled by *Kazatsky v. King David Memorial Park,* 515 Pa. 183, 527 A.2d 988 (1987), in which the Pennsylvania Supreme Court explicitly stated that notwithstanding the earlier cases, Pennsylvania had never recognized section 46 as a valid cause of action. *Kazatsky,* 527 A.2d at 989.

Naturally, the Pennsylvania Supreme Court's pronouncement is law which I must follow. The fact that it has not yet recognized the action, however, only requires that I, once again, predict whether it would do so if the issue were to come before it. The defendant argues that the opinion shows that the Pennsylvania Supreme Court does not approve of section 46 and thus would not adopt it if confronted with the question. At least two decisions of the Superior Court, she argues, have so held. See *Ford v. Isdaner,* 374 Pa.Super. 40, 542 A.2d 137 (1988), *Daughen v. Fox,* 372 Pa.Super. 405, 539 A.2d 858, 861 (1988). Neither case is unequivocal, but even if they were, I am "free to reach a contrary result if [I] predict that the State Supreme Court would hold otherwise;" *Gruber,* 899 F.2d at 1369, especially since other state cases may imply a contrary conclusion. See *Rinehimer v. Luzerne County Community College,* 372 Pa.Super. 480, 494–96, 539 A.2d 1298, 1305 (1988); *Salerno v. Philadelphia Newspapers,* 377 Pa.Super. 83, 87–88, 546 A.2d 1168, 1172–73 (1988). Furthermore, this circuit has held that, "absent a clearer statement from Pennsylvania's highest court, we remain bound by [earlier Third Circuit precedent]" which recognized § 46. *Williams v. Guzzardi,* 875 F.2d 46, 50–52 (3d Cir.1989). Although the question is a close one, it is almost uniformly held that Pennsylvania would, under proper conditions, allow recovery for intentional infliction of emotional distress. See *Andrews v. City of Philadelphia,* 895 F.2d 1469 (3d Cir.1990); *Silver v. Mendel,* 894 F.2d 598, 606 (3d Cir.1990). But see *Clemens v. Gerber Scientific,* 1989 WL 3480 (E.D.Pa.) (Pennsylvania does not rec-

ognize § 46); *Koch v. AT & T,* 1989 WL 37123 (E.D.Pa.) (same).

If Pennsylvania was truly against recognizing § 46, *Kazatsky* would have been an ideal vehicle with which to say so. Instead, the court chose to delve fairly deeply into the elements of this "unrecognized" tort and then dismiss on the grounds that the elements had not been satisfied. In fact, Justice Larsen felt that the court's approach, rather than rejecting it, "adopt[ed] section 46 in this jurisdiction, in spite of what the majority states to the contrary." *Id.* 527 A.2d at 995 (Larsen, J., concurring), 996 (Papadakos, J., concurring) (the court should explicitly adopt § 46).

In *Kazatsky* the plaintiffs sued over a dispute regarding the burial site of their children—the cemetery issued a questionable bill and when the Kazatsky's refused to pay, allowed the plots to descend into disrepair. In such a case, of course, every word is emotionally charged. *Kazatsky*'s main concern was not to sanction every emotional conflict as a matter for the courts. Rather than eliminate the tort, however, the decision turned on the lack of proof of injury: The plaintiffs presented "no evidence at all except their own unsubstantiated averments, concerning their alleged injuries." *Id.* 527 A.2d at 992. Focusing, not on the merits of section 46, but on the obviously distinct concerns over fraudulent or frivolous claims under that section, the court ruled that "if section 46 of the Restatement is to be accepted in this commonwealth, at the very least, existence of the alleged emotional distress must be supported by competent medical evidence." *Id.* 527 A.2d at 995. The instant case, of course, does not implicate the *Kazatsky* court's concerns; here the victim committed suicide, in itself ample evidence of emotional distress.

Although *Kazatsky* actually turned on proof of injury, much of the opinion offered a generalized criticism of section 46. The opinion took aim at the element of "outrageous conduct," citing Daniel Givelber's complaint that the term is subjective and "fails to define the proscribed conduct beyond suggesting that it is very bad in-

deed." *Id.* 527 A.2d at 995 (quoting Givelber, The Right to Minimum Social Decency and the Limits of Evenhandedness: Intentional Infliction of Emotional Distress by Outrageous Conduct, 82 Colum.L.Rev. 42–43 (1982)). As such, he argues, "outrageous conduct" is a subjective function of "the passion and prejudice of the moment." *Id.* These same criticisms, however, can be levelled at the venerated "reasonable conduct" standard for negligence cases. The difference is that here we are dealing with an intentional tort perhaps demanding, to protect the defendant, more specificity. If that is the case, then the issue is not whether "judges would know it when they see it" *Id.* 527 A.2d at 994 (quoting Givelber at 52), but whether the defendant would know it when she does it. The reasoning of *Kazatsky* thus puts great emphasis on the "outrageousness" standard as viewed by the actor—conduct must be sufficiently diabolical that any reasonable actor would know she was incurring liability. Pennsylvania requires that the outrageousness test protect potential defendants by the very extremity of the abomination required for liability.

The Restatement is inconsistent regarding who makes the determination of outrage. The question is for the jury, it says, but only where reasonable people may differ on the point. Restatement (Second) of Torts § 46 comment h. All the definitions, however, deem conduct outrageous only when it is so bad that no reasonable person could say otherwise. See Restatement at comment d (conduct is outrageous when it is "beyond all possible bounds of decency" or when any person would exclaim, "Outrageous!"). Thus, by definition, anything "outrageous" is not of the sort about which reasonable people could possibly differ. *Kazatsky* resolves this ambiguity in favor of the court, and suggests that it should be good and sure the conduct is sufficiently extreme before it places a claim in the hands of the jury. In other words, a court should satisfy itself in the first instance, not merely that there is a reasonable question about outrageousness, but that the conduct almost certainly is outrageous. Only then should the cause go to the jury

for what may amount to little more than a veto power over a court's determination. Cf. *Andrews,* 895 F.2d at 1486; *Cox v. Keystone Carbon Co.,* 861 F.2d 390, 394–95 (3d Cir.1988).

The court's refusal to reject section 46 while at the same time explicating the evils of the "outrageous" standard, suggests that *Kazatsky* is circumscribing rather than halting the development of the tort. The concern is that "outrageous" no longer makes sufficiently clear the extreme nature of the conduct that is a minimum for liability. *Kazatsky,* therefore, cautions the lower courts to make more of their "gatekeeping" power, *Kazatsky,* 527 A.2d at 994, and allow claims to go to the jury in only the most egregious circumstances. Cf. *Andrews,* 895 F.2d at 1486. I now turn to the question of whether the facts alleged in the complaint rise to such a level.

### ii. *Sufficiency of Plaintiff's Claim*

■ Plaintiff cites several cases which suggest that Marder's actions could be seen by a jury as outrageous. All of the cases, however, were decided before *Kazatsky.* See, e.g., *Bartanus v. Lis,* 332 Pa.Super. 48, 480 A.2d 1178 (1984); *Pierce v. Penman,* 357 Pa.Super. 225, 515 A.2d 948 (1986). Both of these cases typify a fairly lenient approach to outrage of the type *Kazatsky* hoped to alter. In *Bartanus,* plaintiff sought recovery on the grounds that his sister and brother-in-law had deliberately attempted to turn his son against him. In *Pierce,* the defendants recklessly failed to turn over medical records to plaintiff, an emotionally disturbed person. In each case, rather than undertaking strenuous inquiry into outrageousness, the court passed that determination to the fact-finder upon the mere showing that a reasonable one could find the conduct outrageous. Before *Kazatsky,* perhaps the fact of decedent's emotional instability and defendant's alleged malice would have supported a finding of outrageousness in the instant case. See Restatement (Second) of Torts § 46 comment f. Now, however, it cannot. Although there is at least a possibility that a jury

could reasonably find Marder's conduct outrageous, a reasonable possibility is no longer sufficient to survive a 12(b)(6) motion. As noted earlier, under *Kazatsky*, courts should satisfy themselves that conduct is almost certainly outrageous before allowing the jury to rule.

The particular facts of the case at bar reveal a sickly woman led astray by a malevolent and misguided sister. The allegations consist solely of various ways defendant's advice—or lack of it—disturbed the decedent. Since there is no allegation that decedent was severely retarded or unstable, defendant's bad counsel, even if it was intentional or reckless, did not take advantage of a disabled person in a manner that this court could consider objectively outrageous. The reasoning of *Kazatsky* suggests that I look at the conduct from the defendant's point of view. In our society, where people can generally speak to one another as they wish to, merely harboring bad intentions should not make us expect civil liability. Marder's bad counsel then, even if malicious, was simply not the kind of conduct she would have known exposed her to liability for the intentional infliction of emotional distress.

Because I cannot find that defendant's conduct was legally outrageous, both counts of plaintiff's complaint have failed to state a claim upon which relief could be granted.