Sue Ann MOORE, Plaintiff–Appellant,

v.

WESTERN FORGE CORPORATION, a foreign corporation; and Crawford & Company, a foreign corporation, Defendants–Appellees.

Nos. 06CA0229, 06CA1557.

Colorado Court of Appeals, Div. IV.

Nov. 15, 2007.

Certiorari Denied Sept. 22, 2008.

§ 24–51–1105, C.R.S.2007.

Fasing Law Firm, P.C., Gregory J. Fasing, Denver, Colorado, for Plaintiff–Appellant.

Thomas Pollart & Miller, LLC, Eric J. Pollart, Greenwood Village, Colorado, for Defendant–Appellee Western Forge Corporation.

White and Steele, PC, David J. Nowak, Denver, Colorado, for Defendant–Appellee Crawford & Company.

Opinion by Judge WEBB.

In this wrongful death action, plaintiff, Sue Ann Moore, appeals the trial court's summary judgment in favor of defendants, Western Forge Corporation (Western) and Crawford & Company (Crawford), as well as the costs awarded against her. We affirm the summary judgment but remand to reduce the cost award.

Moore's husband (decedent) filed a workers' compensation claim against Western, his long-term employer. Western was self-insured and used Crawford to administer its workers' compensation claims. Crawford mailed decedent, who was off work and awaiting surgery for his injury, a Notice of Contest stating that the claim was being contested pending completion of an investigation. Shortly after reading this notice, decedent killed himself.

In an unpublished decision, *Sue Moore v. Industrial Claim Appeals Office*, 2005 WL

1476251 (Colo.App.2005), a division of this court affirmed the panel's decision upholding denial of death benefits based on the ALJ's finding "that decedent's suicidal death was not due to a severe mental disorder created by the injury, but appeared to be triggered by employer's Notice of Contest." The division noted that the psychiatrist testifying for claimant

> conceded that claimant was not clinically depressed at the time of his death, that he became distraught and desperate the moment he received formal notice that the claim would be contested, and that the suicide was an impulsive act related to the stress and worry caused by decedent's fear that he would be terminated if his injury were determined to be non-work-related.

The entire administrative record was included in the summary judgment record here.

In this appeal, Moore asserts that Western's handling of the claim through Crawford, acting as its agent within the scope of authority, was in bad faith and caused decedent emotional distress, which led to his suicide. Moore also asserts that defendants abused the workers' compensation process by contesting decedent's claim.

We conclude that the alleged breach of defendants' duty of good faith and fair dealing would not render them liable for the suicide, even accepting Moore's chain of actual causation; that contesting the claim did not legally or proximately cause the suicide; and that an abuse of process claim cannot be based on actions taken in administering a workers' compensation claim.

## I. Summary Judgment Standard

We review a summary judgment de novo. *Brodeur v. Am. Home Assurance Co.*, 169 P.3d 139, 146 (Colo.2007). Summary judgment is appropriate only if the pleadings and supporting documents demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Id.* The nonmoving party is entitled to the benefit of all favorable inferences reasonably drawn from the undisputed facts; all doubts must be resolved against the moving party. *Id.*

## II. Liability for Suicide

According to Moore, because both Western and Crawford owed decedent a duty of good faith and fair dealing, breach of which would permit recovery of damages for decedent's emotional distress, their liability extends to decedent's suicide upon proof of causation connecting bad faith handling of the claim, resulting emotional distress, and decedent's "uncontrollable impulse" to kill himself, as her expert opined.

Defendants agree that they both owed decedent a duty of good faith, breach of which would make them liable for decedent's emotional distress, but they deny that the duty extends to detecting or preventing suicide. They also assert that because suicide is an independent intervening act, the causal chain articulated by Moore does not establish proximate cause, even assuming breach of their duty resulted in emotional distress which was a factor in the suicide.

Defendants do not dispute, and therefore we accept for purposes of summary judgment, that material factual issues have been raised concerning bad faith and resulting emotional distress. We discern an issue of material fact as to the chain of actual causation leading to decedent's suicide. Nevertheless, we agree with the trial court.

### A. Introduction

The only reported Colorado appellate opinion to address tort liability for suicide is *English v. Griffith*, 99 P.3d 90 (Colo.App. 2004), a negligence action in which the plaintiffs' deceased and the defendant had been roommates. The case is of limited value here because the division held that the defendant did not owe the deceased a legal duty, and for that reason it declined to address causation.

"The courts which have addressed the issue uniformly split the claims into two familiar categories: cases where death is caused by intentional wrongdoing and those where causation is negligent." *Rowe v. Marder*, 750 F.Supp. 718, 723 (W.D.Pa.1990). Here, this approach is complicated by several factors:

- Moore did not plead a claim for, nor does she argue that the facts show, intentional infliction of emotional distress or willful infliction of physical injury by defendants against decedent.
- Moore pleaded a bad faith claim, but did not argue below and does not argue on appeal that this claim must be analyzed under causation principles unique to intentional wrongdoing.
- Moore did not plead a negligence claim, but in response to defendants' reliance below on causation principles derived from negligence cases, she asserted and argues on appeal that those principles also preclude summary judgment because decedent acted on an "uncontrollable impulse."

Nevertheless, we are guided by the following general principles.

In intentional tort cases, several courts have acknowledged that a defendant would be liable for wrongful death if intentional infliction of emotional distress resulted in suicide by the plaintiff's deceased. *See, e.g., Tate v. Canonica,* 180 Cal.App.2d 898, 5 Cal. Rptr. 28 (1960); *Mayer v. Town of Hampton,* 127 N.H. 81, 497 A.2d 1206 (1985).

These courts rely on principles such as Restatement (Second) of Torts § 435A ("A person who commits a tort against another for the purpose of causing a particular harm to the other is liable for such harm if it results, whether or not it is expectable. . . ."). According to Restatement section 870, "One who intentionally causes injury to another is subject to liability to the other for that injury. . . ." Comment (b) to section 870 explains, "An intentional tort is one in which the actor intends to produce the harm that ensues; it is not enough that he intends to perform the act."

■ While not binding on Colorado courts, "the restatements generally provide concise summaries of the law in a certain subject matter and can be persuasive authority." *AE, Inc. v. Goodyear Tire & Rubber Co.,* 168 P.3d 507, 509 n. 1 (Colo.2007); *see also Raleigh v. Performance Plumbing & Heating, Inc.,* 130 P.3d 1011, 1021 (Colo.2006) (Mullarkey, C.J., concurring in part and dissenting

in part) (citing Restatement (Third) of Torts § 29 (Proposed Final Draft No. 1, 2005)); *Bayer v. Crested Butte Mountain Resort, Inc.,* 960 P.2d 70, 79 (Colo.1998) (recognizing that the Restatement (Second) of Torts summarizes "guiding legal principles").

In negligence cases, courts have been unwilling to recognize any duty, breach of which would make a defendant liable for suicide based only on actual causation, absent a special relationship involving treatment, supervision, or custodial control of the deceased. *See English,* 99 P.3d at 94 (collecting cases). At oral argument, Moore conceded that she is not asserting defendants' liability under the special relationship doctrine.

Otherwise, courts have found proximate cause only in very narrow circumstances, such as where negligence resulted in delirium, insanity, or, in some cases, other mental conditions that precluded the deceased from making a rational choice. This limitation on proximate cause derives from "the rationale that the consummated suicide or unsuccessful attempt constitutes an independent intervening act which the original tortfeasor could not reasonably have been expected to foresee." Gregory G. Sarno, Annotation, *Liability of Attorney for Suicide of Client Based on Attorney's Professional Act or Omission,* 41 A.L.R.4th 351 (1985); *see, e.g., Sindler v. Litman,* 166 Md.App. 90, 110, 887 A.2d 97, 113 (2005)(collecting cases); *McLaughlin v. Sullivan,* 123 N.H. 335, 337, 461 A.2d 123, 124 (1983) (cited with approval in *English,* 99 P.3d at 94).

These general principles reduce this case to three questions. First, should liability for suicide based on breach of the duty of good faith and fair dealing be determined by applying the broad legal causation principles of intentional torts? Second, if those principles do not apply, does the scope of this duty expose a defendant to potential liability for an insured's suicide based on only actual causation? Third, if the scope of this duty is more limited, did Moore present sufficient evidence of legal or proximate cause, in addition to actual cause, to avoid summary judgment? We answer these questions in the negative.

## B. Duty of Good Faith and Fair Dealing

Moore cites no authority, nor have we found any, holding that breach of a claims administrator's or an insurer's duty of good faith and fair dealing could lead to liability for the suicide of an insured. Nevertheless, she urges us to reach this conclusion based on language in many Colorado cases concerning the obligations of insurers and claims administrators to insureds in the first-party setting, such as that before us, and on liability for emotional distress damages in a bad faith case.

In *Cary v. United of Omaha Life Insurance Co.*, 68 P.3d 462, 466 (Colo.2003), for example, the court held:

> When the actions of a defendant are similar enough to those typically performed by an insurance company in claim administration and disposition, we have found the existence of a special relationship sufficient for imposition of a duty of good faith and tort liability for its breach....

Our supreme court has also recognized that in the first-party setting an insured "is particularly vulnerable" and insurers "are encouraged to delay payment ... with an eye toward settling for a lesser amount than that due." *Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1273 (Colo.1985)(quoting *Bibeault v. Hanover Ins. Co.*, 417 A.2d 313, 318 (R.I. 1980)).

In *Goodson v. American Standard Insurance Co.*, 89 P.3d 409, 415 (Colo.2004), the court held that noneconomic damages in a bad faith case include emotional distress.

### 1. Intentional Tort

■ Although we are concerned that Moore has never expressly argued for an intentional tort analysis, she cited several cases that include discussion of this issue both below and on appeal. And this analysis is pivotal to the partial dissent. Hence, we begin with intentional tort analysis, but conclude that it does not apply to a bad faith claim.

In *Travelers Insurance Co.*, 706 P.2d at 1272, the supreme court rejected the court of appeals' conclusion that simple negligence should be applied to an insurer's conduct in a first-party bad faith case. The court articulated a two-element test: "unreasonable conduct, and knowledge that the conduct is unreasonable or a reckless disregard for the fact that the conduct is unreasonable." *Id.* Thus, a first-party bad faith case is more like an intentional tort action than negligence.

■ However, "a claim for outrageous conduct must be based upon action that is more egregious than either the conduct underlying a bad faith breach of contract claim or a willful and wanton breach of contract claim." *Munoz v. State Farm Mut. Auto. Ins. Co.*, 968 P.2d 126, 129 (Colo.App.1998). The *Munoz* division contrasted an insurance bad faith case, *Farmers Group, Inc. v. Williams*, 805 P.2d 419 (Colo.1991), with outrageous conduct cases, including *Destefano v. Grabrian*, 763 P.2d 275 (Colo.1988). *Accord McKelvy v. Liberty Mut. Ins. Co.*, 983 P.2d 42, 44 (Colo.App.1998).

Most cases applying intentional tort analysis in suicide cases involve intentional infliction of emotional distress, sometimes referred to as outrageous conduct. *See Rowe*, 750 F.Supp. at 723 ("[D]efendant's actions amounted to an intentional infliction of emotional distress...."); *Tate*, 180 Cal.App.2d at 906, 5 Cal.Rptr. at 35 (analyzing "[t]he extent of liability for intentionally causing mental distress"); *Mayer*, 127 N.H. at 87, 497 A.2d at 1211 ("[W]e find ... it is appropriate to require proof of extreme and outrageous conduct...."); *R.D. v. W.H.*, 875 P.2d 26, 28 (Wyo.1994) ("These claims included ... intentional infliction of emotional distress...."). *But see State ex rel. Richardson v. Edgeworth*, 214 So.2d 579, 586 (Miss. 1968)(abuse of process).

Other intentional tort suicide cases involve "willful tortious conduct ... intended to cause a victim physical harm." *Kimberlin v. De Long*, 637 N.E.2d 121, 128 (Ind.1994).

■ In our view, the intentional tort approach to liability for suicide should not be applied in a bad faith case because breach of that duty does not involve an intent to cause either emotional distress or physical injury. As the *Tate* court explained, this approach:

would not apply where the *act* of the defendant was intentionally done, but there was no intent to cause injury. It is applicable only where the actor *intended to cause injury,* and the injury is a substantial factor in bringing about the suicide ... if the suicide can be shown to have been caused by the type of injury that the defendants intended to inflict....

180 Cal.App.2d at 908, 5 Cal.Rptr. at 36 (emphasis original).

Accordingly, we decline to treat bad faith as an intentional tort in determining liability for suicide of the insured.

### 2. Recovery of Emotional Distress Damages

■ We are not persuaded otherwise by Moore's argument linking alleged bad faith in processing the claim, decedent's emotional distress, and his suicide.

This argument conflates duty with causation. We address and reject it as part of our duty analysis because "the concepts of duty and proximate cause are often interchangeable, and can be easily confused, when the analysis of both involves the common question of foreseeability." *Walcott v. Total Petroleum, Inc.,* 964 P.2d 609, 611 (Colo.App. 1998).

Moore cites no case, nor have we found one, holding a defendant liable for suicide because breach of that defendant's duty permitted recovery of damages for emotional distress. To the contrary, in *Worsham v. Nix,* 83 P.3d 879 (Okla.Civ.App.2003), the court rejected liability for suicide while reversing for further proceedings because emotional distress damages could be awarded against the attorney whose negligence allegedly caused the client's suicide.

Absent specific authority, our general approach must be "determining whether the duty imposed on the actor was designed to protect the one harmed from the risk of harm created by the hazard in question." *Walcott,* 964 P.2d at 612.

■ Emotional distress damages are recoverable in bad faith cases because "[g]iven that insureds purchase insurance policies to obtain financial security and peace of mind, emotional distress is a likely and foreseeable consequence of a bad faith denial of benefits afforded under the contract." *Goodson,* 89 P.3d at 417; *cf. Giampapa v. Am. Family Mut. Ins. Co.,* 64 P.3d 230, 243 (Colo.2003). We discern no basis for extending protection of an insured's interest in "financial security and peace of mind" to protection against the risk that the insured would choose to commit suicide because of frustration over the claims administration process.

■ Such recovery of emotional distress damages is "based upon traditional tort principles of compensation for injuries actually suffered, including emotional distress." *Ballow v. PHICO Ins. Co.,* 878 P.2d 672, 677 (Colo.1994). But as discussed in Part C below, traditional tort causation principles encompass liability for suicide only in very narrow circumstances.

Moreover, several other intentional torts allow recovery for emotional distress damages. *See* CJI–Civ. 4th 17:11 (malicious prosecution), 21:5 (false arrest), 22:13 (defamation), 28:16 (invasion of privacy). Yet like bad faith, these torts do not involve an intent to cause emotional suffering. Hence, accepting Moore's emotional distress damages argument would circumvent the rationale that we have adopted limiting liability for suicide to intentional infliction of emotional distress.

Accordingly, we decline to recognize liability for suicide in a bad faith case because the actor is liable for emotional distress damages, and emotional distress could be a factor in the suicide.

### 3. Scope of Duty

■ Although the existence of the duty of good faith and fair dealing is beyond dispute, the unusual circumstance of an insured's suicide requires us to determine its scope. We conclude that this duty does not create liability for suicide based only on actual causation.

■ Both the existence and scope of a tort duty are questions of law to be decided by the court. *Keller v. Koca,* 111 P.3d 445, 448 (Colo.2005). In determining the scope of a duty, the court should look to the risk involved, the foreseeability of the injury

weighed against the social utility of the actor's conduct, the magnitude of the burden to guard against the injury, and the consequences of placing the burden on the actor. *See Taco Bell, Inc. v. Lannon,* 744 P.2d 43, 46 (Colo.1987) (whether duty of a landowner to exercise reasonable and ordinary care to make premises safe encompasses taking reasonable measures to protect patrons from injuries caused by the criminal acts of unknown third persons). "No one factor is controlling, and the question of whether a duty should be imposed in a particular case is essentially one of fairness under contemporary standards—whether reasonable persons would recognize a duty and agree that it exists." *Id.*

Because breach of the duty of good faith and fair dealing makes the actor liable for emotional distress damages, here we will assume that in isolated cases suicide could be caused by emotional distress arising from bad faith claim processing. But we conclude that the foreseeability of such a suicidal reaction is very low. *See McPeake v. William T. Cannon, Esquire, P.C.,* 381 Pa.Super. 227, 234, 553 A.2d 439, 442 (1989) ("Suicide has been recognized as an act that is so extraordinary as not to be reasonably foreseeable...."); *Chalhoub v. Dixon,* 338 Ill. App.3d 535, 540, 272 Ill.Dec. 860, 788 N.E.2d 164, 168 (2003) ("suicide is an independent intervening event that the tortfeasor cannot be expected to foresee"); *see also Cleveland v. Rotman,* 297 F.3d 569, 572 (7th Cir.2002) (same); *Watters v. TSR, Inc.,* 904 F.2d 378, 383 (6th Cir.1990) (same); *cf. Crolley v. Hutchins,* 300 S.C. 355, 357, 387 S.E.2d 716, 718 (1989)("One does not expect a person to attempt suicide as a natural and probable result of being served a drink while intoxicated.").

In contrast, the burden on claims administrators to guard against suicide would be extremely high because they would be required to make judgments about the mental health of insureds. Claims administrators do not have special expertise or professional training with which to make such judgments. *Cf. English,* 99 P.3d at 94 ("[a]n individual, such as defendant, cannot reasonably be expected to anticipate the mental health conse-

quences"); *see also Johnstone v. City of Albuquerque,* 140 N.M. 596, 601, 145 P.3d 76, 81 (Ct.App.2006)("[L]aypeople cannot be reasonably expected to anticipate the mental health consequences of their acts or omissions." (quoting *Chalhoub,* 338 Ill.App.3d at 539, 272 Ill.Dec. 860, 788 N.E.2d at 167)); *McPeake,* 381 Pa.Super. at 235, 553 A.2d at 443 ("an attorney does not possess the ability either to perceive that a client is likely to commit suicide, or to prevent the suicide").

Further, placing this burden on claims administrators would either create an unreasonable risk of liability for wrongful death, *cf. English,* 99 P.3d at 94, or erode their right to investigate and contest claims brought by persons who are perceived as unstable. *See Brodeur,* 169 P.3d at 152 ("[T]he insurer is afforded wide latitude in its ability to investigate claims and to resist false or unfounded efforts to obtain funds."); *Bailey v. Allstate Ins. Co.,* 844 P.2d 1336, 1339 (Colo.App.1992) (in first-party claims, insurer owes "competing duties to its policyholders and other shareholders not to honor meritless claims").

Our conclusion is consistent with cases elsewhere that have held other duties did not create potential liability for suicide based only on actual causation. *See, e.g., Cleveland,* 297 F.3d at 573 ("Whether [the lawyer] had a duty to prevent [his client's] suicide depends on the suicide's foreseeability, its likelihood, the magnitude of the burden of guarding against it, and the potential consequences of placing that burden on [the lawyer]."); *Bruzga v. PMR Architects, P.C.,* 141 N.H. 756, 759, 693 A.2d 401, 403 (1997) (in rejecting liability for the suicide of a patient in a mental health facility who hanged himself from an exposed component of the fire sprinkler system, the court said, "While we recognize that architects and contractors have a duty to design and construct safe structures, this duty is not limitless." (citation omitted)); *see also Worsham,* 83 P.3d at 886 (applying similar analysis in legal malpractice case).

Accordingly, we conclude that breach of the duty of good faith and fair dealing does not expose a defendant to potential liability for the suicide of an insured based only on actual causation.

Our inquiry does not end here, however, because Moore also contends that her evidence precluded summary judgment even under the particular proximate cause limitations adopted in suicide cases based on negligence.

### C. Proximate Cause

■ As indicated, we perceive a disputed issue of material fact whether defendants' conduct was the actual cause of decedent's suicide. But "[o]nce actual cause is established, legal causation must then be determined." *City & County of Denver v. Indus. Comm'n*, 690 P.2d 199, 205 (Colo. 1984)(Quinn, J., dissenting); *see also* Restatement (Third) of Torts § 29 cmt. g (Tentative Draft). We discern no disputed issue of material fact concerning legal or proximate cause.

■ A defendant's conduct

is not a cause of another's injuries if, in order to bring about such injuries, it was necessary that the conduct combine or join with an intervening cause which also contributed to cause the injuries, but which intervening cause would not have been reasonably foreseen by a reasonably careful person under the circumstances.

*Scharrel v. Wal-Mart Stores, Inc.*, 949 P.2d 89, 93 (Colo.App.1997); *see also Redden v. SCI Colo. Funeral Servs., Inc.*, 38 P.3d 75, 81 (Colo.2001)("An intervening cause only relieves the defendant of liability if it was not reasonably foreseeable.").

■ In applying intervening cause principles, we recognize that the matter is not one of causation, "but an attempt to spell out rules of law limiting the liability of a negligent actor, using the *language* of causation." *Tate*, 180 Cal.App.2d at 908, 5 Cal.Rptr. at 35 (emphasis in original). As Dean Prosser has observed, "Again the issue is merely one of the policy which imposes liability, and any attempt to deal with it in the language of the fact of causation can lead only to perplexity and bewilderment." W. Prosser, *Proximate Cause in California*, 38 Cal. L.R. 369, 419–20 (1982).

■ Because suicide is usually treated as a voluntary and willful choice, "the person committing suicide is in effect both the victim and the actor." *Webstad v. Stortini*, 83 Wash.App. 857, 866, 924 P.2d 940, 945 (1996). Despite judicial concern over "a societal value in individual freedom and its counterpart, individual responsibility," *Jamison v. Storer Broad. Co.*, 511 F.Supp. 1286, 1291 (E.D.Mich.1981), negligence liability for suicide has been recognized in many jurisdictions under the limited circumstances set forth in the Restatement (Second) of Torts § 455 (1965):

If the actor's negligent conduct so brings about the delirium or insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other to himself while delirious or insane, if his delirium or insanity (a) prevents him from realizing the nature of his act and the certainty or risk of harm involved therein, or (b) makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason.

■ Section 455 "does not set forth a duty, but describes a rule of causation ... [which] presupposes an existing legal duty." *English*, 99 P.3d at 95. Here, defendants' duty of good faith and fair dealing is undisputed. Although Moore did not plead a negligence claim, section 455 underlies many of the cases cited by her, and it encompasses her theory that our inquiry should be limited to whether summary judgment was improper because she established disputed issues of material fact as to causation.

Hence, we accept Moore's invitation to apply section 455, but we conclude that the summary judgment record does not show any basis for liability under this section because Moore failed to establish that when decedent took his life, he was suffering from delirium or insanity that made his act involuntary.

■ The comment to clause (b) of section 455 explains that it applies when the "act [of suicide] is done under an insane impulse which is irresistible because his insanity has prevented his reason from controlling his actions." Thus, "[w]hen the decedent acts under the conditions expounded in [section]

455, he is not acting with volition, and his suicide, therefore, does not breach the chain of causation." *R.D.*, 875 P.2d at 28 (upholding the sufficiency of a complaint that alleged defendant's actions resulted in "the creation of a delirium or insanity"); *Clift v. Narragansett Television L.P.*, 688 A.2d 805, 811 (R.I.1996) (affidavit of plaintiff's medical expert suggested "that the decedent's suicide resulted from an uncontrollable impulse that was brought about by a delirium or insanity"). *But see Grant v. F.P. Lathrop Constr. Co.*, 81 Cal.App.3d 790, 799, 146 Cal.Rptr. 45, 50 (1978) (rejecting distinction between mental condition and mental illness or insanity).

▮ As some of the cases Moore cites indicate, the volition question may raise a factual dispute that must be resolved by the jury. *See, e.g., Clift* (reversing summary judgment); *Stafford v. Neurological Med., Inc.*, 811 F.2d 470, 473 (8th Cir.1987)(reversing J.N.O.V.).

We discern no such factual dispute here.

Moore cites *Orcutt v. Spokane County*, 58 Wash.2d 846, 853, 364 P.2d 1102, 1105 (1961), where the defendant's negligent conduct resulted in severe brain injury to the deceased. But the record contains no evidence of physical injury caused by Crawford's contesting the claim.

Further, the record does not show that decedent's suicide resulted from "delirium or insanity" which made "it impossible for him to resist an impulse caused by his insanity." § 455.

Moore's psychiatric expert testified in the workers' compensation proceeding:

- "On the day of his death [decedent] contacted the personnel office, received at least two letters from [Crawford] and he felt desperate and killed himself."
- "The managing of the claim was instrumental in his belief that he would not be able to get appropriate treatment and return to work. . . . But in my opinion it's the actual injury, his inability to walk across the room and do the things that were required of him at work, and his belief that he would be terminated if it was not work related that caused his death."
- "His identity as a person in addition to being the breadwinner at home was being a loyal employee of Western Forge. And I think when he was not able to do that work and saw no avenue to be able to return to work, he felt he would be terminated, then he killed himself."

This testimony creates a factual issue whether "but for" Crawford's alleged bad faith in handling decedent's claim, he would not have committed suicide. However, the evidence must also permit a reasonable jury to determine that Crawford's actions caused decedent to suffer a mental illness. *See Jamison*, 511 F.Supp. at 1291–92 ("If the person commits suicide in response to a mental condition, as distinguished from a mental illness, a prior tortfeasor, perhaps responsible in part for that condition, will not be liable. . . . [T]he crucial distinction must be made between a mental condition and a mental illness."); *Tate*, 180 Cal.App.2d at 915, 5 Cal.Rptr. at 40 ("[W]here the negligent wrong only causes a mental condition in which the injured person is able to realize the nature of the act of suicide and has the power to control it if he so desires, the act then becomes an independent intervening force and the wrongdoer cannot be held liable for the death. On the other hand, if the negligent wrong causes mental illness which results in an uncontrollable impulse to commit suicide, then the wrongdoer may be held liable for the death.").

Although Moore's expert opined that "denial of [decedent's] claim resulted in his uncontrollable impulse to commit suicide," he did not show the intervening link: that this impulse was the result of delirium or insanity. *Cf. Jamison*, 511 F.Supp. at 1292 (scrutinizing expert's testimony for exact diagnosis). Rather, in his affidavit prepared to oppose summary judgment Moore's expert stated, "In my opinion, [decedent's] belief that he would be terminated from employment if he had a genetically based, age related, medical problem limiting his ability to do his usual work led to his apparent impulsive decision to commit suicide."

Cases that "place less emphasis on the mental state and more on the causal connec-

tion," *Halko v. New Jersey Transit Rail Operations, Inc.,* 677 F.Supp. 135, 142 (S.D.N.Y.1987), remain the minority view, and go beyond the "delirium or insanity" formulation in section 455. As one court has observed, "[i]t is not enough to show that a [decedent's] depression was a 'powerful contributor' to the decedent's 'feeling of hopelessness and helplessness.'" *Worsham,* 83 P.3d at 887 (quoting *District of Columbia v. Peters,* 527 A.2d 1269, 1277 (D.C.1987)).

Instead, we adhere to the distinction between mental condition and mental illness because mental illness is a useful limiting principle on a negligent tortfeasor's wrongful death liability. The extreme nature of suicide would alone give credence to an expert's ad hoc opinion that the deceased must have been afflicted with a mental condition, even if the expert had never met the deceased, as here. Cases that depart from the "delirium or insanity" test do not articulate criteria for mental condition, such as the categories set forth in *Diagnostic and Statistical Manual of Mental Disorders* (4th ed.2000). In contrast, delirium or insanity can be assessed based on objective factors such as the deceased's ability to attend to daily affairs and orientation as to person, time, and place. *Cf. Terry v. Sullivan,* 58 P.3d 1098, 1101–02 (Colo.App.2002) (discussing criteria sufficient to toll the statute of limitations based on mental disability, including "[inability] to function in day-to-day affairs").

As explained in *Jamison,* 511 F.Supp. at 1291:

> While current understanding of mental illness has permitted the judicial recognition that suicide may be "involuntary," it is nonetheless true, that, short of a basis for a conclusion that the self destruction was an involuntary act produced by a mental illness in the nature of a psychosis, this society elects to promote individual accountability for such choices. The legal formulation must strike the balance between defendant's responsibility for the consequences of its acts and the consensual societal value that requires life-affirming conduct.

Accordingly, we conclude that Moore did not establish a disputed factual issue concerning proximate cause under section 455.

In sum, the claim that defendants are liable for decedent's suicide fails based on principles of both duty and causation.

### III. Abuse of Process

Moore next contends the trial court erred in granting defendants summary judgment on her abuse of process claim. Again, we disagree.

A claim for abuse of process requires a plaintiff to prove the following elements: (1) an ulterior purpose for the use of judicial process; (2) willful action in the use of that process which is not proper in the regular course of the proceedings, that is, use of a legal proceeding in an improper manner; and (3) resulting damage. *Walker v. Van Laningham,* 148 P.3d 391, 394 (Colo. App.2006). Although the litigant's motive may be important in determining whether there was an ulterior purpose, the plaintiff must still establish that, viewed objectively, an improper use of judicial process occurred. *Id.*

Here, Moore argues that defendants abused the workers' compensation process because they "intended solely to deny and delay payment of a claim that the defendants knew was owed to [decedent]," and that they filed the Notice of Contest allegedly "to coerce and pressure [decedent] into giving up his workers' compensation benefits and accept inferior health insurance coverage instead."

A cause of action for abuse of process reflects the need to protect the integrity of judicial proceedings. *Gordon v. Cmty. First State Bank,* 255 Neb. 637, 651, 587 N.W.2d 343, 353 (1998). Thus, the general rule is that "the judicial process must in some manner be involved." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 121, at 898 (5th ed.1984).

Moore cites no case, and we have found none, extending the abuse of process tort to actions taken in the administration of workers' compensation claims, such as filing

a Notice of Contest. Nor has any Colorado appellate case accepted an abuse of process claim based on action taken in an administrative proceeding.

The vast majority of jurisdictions decline to recognize abuse of process in nonjudicial proceedings. *See, e.g., Stolz v. Wong Commc'ns Ltd. P'ship*, 25 Cal.App.4th 1811, 31 Cal.Rptr.2d 229 (1994) (misuse of the Federal Communications Commission broadcast licensing process failed to state a cause of action for abuse of process because no actionable abuse of judicial process was alleged); *Kirchner v. Greene*, 294 Ill.App.3d 672, 229 Ill.Dec. 171, 691 N.E.2d 107 (1998) (abuse of process claim based on the initiation of investigative proceedings by the Department of Children and Family Services failed because no court process was involved); *Gordon v. Cmty. First State Bank*, 255 Neb. at 651, 587 N.W.2d at 353 (abuse of administrative process failed to state a cause of action for abuse of process); *McCarthy v. KFC Corp.*, 607 F.Supp. 343 (W.D.Ky.1985) (employer's resistance to a claim for unemployment compensation awards did not state claim for abuse of process because no judicial process involved); *Stagemeyer v. County of Dawson*, 192 F.Supp.2d 998, 1010 (D.Neb.2002)("The 'process' in an abuse-of-process claim means judicial, as opposed to administrative, process because the purpose of the tort is to preserve the integrity of the court and the judicial process."); *O'Hayre v. Bd. of Educ.*, 109 F.Supp.2d 1284, 1296–97 (D.Colo.2000) (suspension of student implemented by school administrators was not actionable "process" because it did not involve "any contact with a judicial forum"); *Char v. Matson Terminals Inc.*, 817 F.Supp. 850, 858–59 (D.Haw.1992) (appeal to state unemployment agency was not "process" within meaning of abuse of process tort; "in an abuse of process claim, 'it is clear that the judicial process must in some manner be involved'" (quoting *McCarthy*, 607 F.Supp. at 345)).

Consistent with the analysis in these cases, which we find to be well reasoned, we decline to extend abuse of process to a workers' compensation proceeding because such claims do not involve any contact ·with a judicial forum. *Cf. Brodeur*, 169 P.3d at 149 (discussing differences between workers' compensation and judicial proceedings).

Accordingly, we conclude that the trial court did not err in granting summary judgment for defendants on Moore's abuse of process claim.

Our affirmance of the summary judgment moots Moore's contention that the trial court erred in denying her motion to add punitive damages.

## IV. Costs

Finally, Moore contends the trial court erred in awarding $67,061 in costs to defendants. We agree in part.

■ An award of costs is within the discretion of the trial court and will not be overturned absent a clear abuse of discretion. *Foster v. Redd*, 128 P.3d 316, 319 (Colo.App. 2005).

■ "A party seeking costs must provide the court with sufficient information and supporting documentation to allow a judge to make a reasoned decision for each cost item presented." *Brody v. Hellman*, 167 P.3d 192, 206 (Colo.App.2007); *see Fenton v. Fibreboard Corp.*, 827 P.2d 564, 569–70 (Colo.App.1991)(setting aside award of costs where party did not provide documentation indicating how costs had been incurred or that they were necessary and reasonable), *aff'd in part and rev'd in part on other grounds*, 845 P.2d 1168 (Colo.1993).

### A. Costs for Expert's Assistant

■ We first reject Moore's argument that the cost award should not have included fees for an expert witness's assistant.

Moore relies on *Western Fire Truck, Inc. v. Emergency One, Inc.*, 134 P.3d 570, 578 (Colo.App.2006), where the division concluded that costs for a testifying expert's assistant are not authorized by section 13–33–102(4), C.R.S.2007. *See also Perkins v. Flatiron Structures Co.*, 849 P.2d 832, 836 (Colo. App.1992).

However, in *In re Estate of Breeden*, 87 P.3d 167, 174–75 (Colo.App.2003), the division awarded costs for an expert's assistant, explaining that *Perkins* only applies to costs

awarded under section 13–33–102(4) (expert witness trial testimony), and in contrast "[t]he list of expenses that may be awarded as costs under section 13–16–122 is illustrative and not exclusive."

Moreover, here the trial court reviewed the expert's bill in detail and found that the costs associated with the assistant were reasonable. We cannot say that this finding is an abuse of discretion.

### B. Adequate Documentation of Costs

■ We next address Moore's argument that bills of several of defendants' experts did not provide sufficient detail to support the trial court's award of their costs. We agree in part.

Our examination of the bills contested by Moore shows that all but one of the experts provided sufficient information to support the costs award.

The bill from defendants' expert attorney only states that fees totaling $14,858.39 were incurred. The record does not contain any additional documentation to support this award. *Cf. Am. Water Dev., Inc. v. City of Alamosa*, 874 P.2d 352, 383 (Colo.1994) ("Counsel is not required 'to record in great detail how each minute of his time was expended. But at least counsel should identify the general subject matter of his time expenditures.'" (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 n. 12, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983))).

Accordingly, we conclude the trial court erred in finding that the fees of the attorney were reasonable. On remand, these fees shall be deducted from the costs awarded.

The summary judgment is affirmed, and the case is remanded to reduce the costs award.

Judge BERNARD concurs.

Judge VOGT concurs in part and dissents in part.

Judge VOGT concurring in part and dissenting in part.

The primary issue in this appeal is whether defendants were entitled to summary judgment on the basis that plaintiff Moore's husband's suicide precluded liability on Moore's claim for bad faith adjustment of a workers' compensation claim. I conclude they were not, and therefore respectfully dissent from the majority's affirmance of summary judgment on the bad faith claim. I agree with the majority that summary judgment was proper on the abuse of process claim.

My analysis of the bad faith issue starts with the following principles.

First, workers' compensation insurers, including self-insured employers, and their claims adjusters owe a duty of good faith and fair dealing to injured employees in investigating and processing workers' compensation claims. *Scott Wetzel Services, Inc. v. Johnson*, 821 P.2d 804, 813 (Colo.1991); *Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1275–76 (Colo.1985).

Second, an insured who prevails on a claim for bad faith breach of an insurance contract is entitled to recover damages, based on traditional tort principles of compensation, for injuries actually suffered, including emotional distress. *Goodson v. American Standard Ins. Co.*, 89 P.3d 409, 415 (Colo.2004); *Ballow v. PHICO Ins. Co.*, 878 P.2d 672, 677 (Colo. 1994). The *Goodson* court explained: "Given that insureds purchase insurance policies to obtain financial security and peace of mind, emotional distress is a likely and foreseeable consequence of a bad faith denial of the benefits afforded under the contract." 89 P.3d at 417; *see also Savio*, 706 P.2d at 1273 ("[O]nce a calamity has befallen an employee covered by workers['] compensation . . ., the injured party is particularly vulnerable because of the injury or loss.").

Third, the "traditional tort principles of compensation for injuries actually suffered," *Goodson*, 89 P.3d at 415 (quoting *Ballow*, 878 P.2d at 677), include the principle that an injured party is entitled to compensation for its actual losses proximately caused by the tortfeasor's conduct, even though the tortfeasor did not necessarily foresee the full extent of those losses or the specific injury suffered. *Vanderbeek v. Vernon Corp.*, 50 P.3d 866, 872 (Colo.2002); *HealthONE v. Rodriguez*, 50 P.3d 879, 889 (Colo.2002).

Applying these principles to this case leads me to conclude that, if plaintiff can prove that defendants breached their duty to act in good faith, she would be entitled to all damages proximately resulting from defendants' breach of their duty, including damages flowing from her husband's emotional distress. Where emotional distress is the proximate result of a tortfeasor's intentional or bad faith conduct, the fact that it was so severe as to lead to suicide does not, in my view, preclude either imposition of liability on, or recovery of damages from, the tortfeasor who caused the distress.

In reaching a contrary conclusion, the majority relies on negligence cases holding that suicide is such an extraordinary event that a negligent tortfeasor cannot be held liable for it absent special circumstances. Here, however, plaintiff is asserting a claim for bad faith adjustment of a workers' compensation claim. In such circumstances, I view the negligence analysis relied on by the majority as of limited value.

Our supreme court has recognized that negligence principles do not necessarily apply to bad faith claims against workers' compensation insurers. *See Scott Wetzel Services*, 821 P.2d at 810 ("In *Savio*, . . . we held that the negligence standard by which the breach of an insurer's duty of good faith is to be determined in the context of a claim by a third party against the insured is not applicable when a claim is asserted by a worker against the workers' compensation insurer."). Consistent with that recognition, courts that have acknowledged the general rule that suicide may preclude liability in a negligence action have similarly recognized that a different standard applies when the tortfeasor's conduct was intentional rather than merely negligent. *See Rowe v. Marder*, 750 F.Supp. 718, 723–24 (W.D.Pa.1990) (where suicide results from intentional rather than negligent conduct, "the trend of recent cases is toward allowing recovery" (quoting 1 Speiser, *Wrongful Death* 85 (1975 & 1989 Supp.))), *aff'd*, 935 F.2d 1282 (3d Cir.1991); *Tate v. Canonica*, 180 Cal.App.2d 898, 5 Cal.Rptr. 28, 36–37 (1960); *Mayer v. Town of Hampton*, 127 N.H. 81, 497 A.2d 1206 (N.H.1985); *R.D. v. W.H.*, 875 P.2d 26, 30–31 (Wyo.1994).

Under these cases, the tortfeasor may be liable for the suicide of another if his or her wrongful conduct is a substantial factor in creating the mental condition that led to the decedent's suicide. *See R.D.*, 875 P.2d at 30–31 (collecting cases).

The analysis of the New Hampshire Supreme Court in *Mayer* is particularly instructive. In that case, the court was called upon to decide "whether New Hampshire recognizes an exception to the general rule that tort actions may not be maintained which seek damages for the suicide of another." 497 A.2d at 1209. In answering that question in the affirmative, the court relied on principles that are consistent with the Colorado case law discussed above:

> The law of torts recognizes that a defendant who intentionally causes harm has greater culpability than one who negligently does so. . . . When the wrong alleged is intentional, the defendant "is responsible for the injuries directly caused even though they may be beyond the limits of foreseeability," proof of which is required in a negligence action. . . . In most cases of intentional torts "[t]he defendant's liability for the resulting harm extends . . . to consequences which the defendant did not intend, and could not reasonably have foreseen, upon the obvious basis that it is better for unexpected losses to fall upon the intentional wrongdoer than upon the innocent victim." W. Prosser and W. Keeton, The Law of Torts § 9, at 40 (5th ed.1984) (footnote omitted). . . .
>
> Under [the Restatement (Second) of Torts], liability for unintended resulting harm is based upon proof of the tortfeasor's wrongful intent, and consideration of the degree of moral wrong and the seriousness of the harm which he intended. Consideration of these factors, as opposed to the foreseeability of the harm as in negligence actions, is consistent with the policy behind imposing liability for intentional torts: compensating the victim and deterring intentional harm to others.

*Id.* at 1209–10 (additional citations omitted).

While acknowledging that a first-party bad faith case is "more like an intentional tort action than negligence," the majority never-

theless declines to apply the analysis applicable to intentional torts because Moore did not plead intentional infliction of emotional distress or outrageous conduct and because there is no allegation that defendants intended to cause Moore's husband's suicide. I do not agree that those facts warrant applying a negligence analysis to the issue.

First, although some courts have specifically required an additional showing of outrageous conduct or intent to cause emotional distress, not all have done so. For example, in *R.D.*, the Wyoming Supreme Court held that one who intentionally commits a tort "will be liable for the result even though he does not intend to cause the emotional or psychiatric illness" that was a substantial factor in bringing about the suicide. 875 P.2d at 31. In my view, that analysis is consistent with the position taken by our supreme court in *Vanderbeek* and *HealthONE,* cited above.

Second, although Moore's complaint does not include a separate cause of action for intentional infliction of emotional distress or outrageous conduct, it alleges that defendants acted unreasonably and in "the utmost bad faith," knowing their conduct and position were unreasonable, in adjusting the workers' compensation claim. The complaint further alleges that defendants' conduct was attended by circumstances of fraud, malice, or willful and wanton conduct sufficient to support recovery of punitive damages. While I am by no means persuaded that plaintiff can establish her allegations, I conclude that her complaint sufficiently alleges the type of conduct that takes this case out of the general rule applicable where a suicide results from negligence.

In regard to causation, the administrative law judge in the workers' compensation proceeding found as a matter of fact that Moore's husband would not have committed suicide but for defendants' claim denial, and that his receipt of the notice of contest was the final event triggering the suicide. The Industrial Claim Appeals Office and this court concluded that that finding was supported by the evidence. I also note that, in the workers' compensation context, divisions of this court have held that a suicide or

suicide attempt that is causally related to an industrial injury is compensable. *See Dependable Cleaners v. Vasquez,* 883 P.2d 583, 585 (Colo.App.1994) ("[I]f the industrial injury causes a severe mental condition, which in turn causes an injured worker to commit an act resulting in the worker['s] death, then such death may still be compensable."); *Jakco Painting Contractors v. Industrial Commission,* 702 P.2d 755, 757 (Colo.App.1985). While the holding in these cases was based in part on the "beneficent purposes" of workers' compensation, *Jakco,* 702 P.2d at 757, whereas this is a tort action, the cases nevertheless support the conclusion that suicide does not invariably cut off the chain of causation between injury and recovery for that injury— particularly where, as here, an expert has opined that denial of the claim resulted in an "uncontrollable impulse to commit suicide."

Finally, I am not persuaded that allowing plaintiff to go forward on her bad faith claim would have the adverse consequences posited in the majority opinion.

The majority reasons that the result urged by plaintiff would place a burden on claims administrators to make judgments about the mental health of insureds, would potentially create an unreasonable risk of liability, and could erode an insurer's right to investigate and contest claims brought by persons who may be unstable.

The first proposition is questionable, in that the supreme court's recognition that insurers and claims adjusters can be liable for emotional distress damages would seem necessarily to assume that such parties would be able to anticipate the mental health consequences of their acts. *See Goodson,* 89 P.3d at 417 ("emotional distress is a likely and foreseeable consequence of a bad faith denial" of insurance benefits).

More important, the concerns raised by the majority are already adequately addressed under our case law. Because there is no fiduciary or quasi-fiduciary relationship implicated in a first-party insurance context, a first-party bad faith claimant has the additional burden of proving, not only unreasonable conduct, but also that "the insurer either knowingly or recklessly disregarded the va-

lidity of the insured's claim." *Id.* at 415. This standard of care, the supreme court has held, "reflects a reasonable balance between the right of an insurance carrier to reject a non-compensable claim submitted by its insured and the obligation of such carrier to investigate and ultimately approve a valid claim." *Id.* (quoting *Savio,* 706 P.2d at 1275). Because the concerns cited by the majority are already addressed by the showing required to establish a bad faith claim in a first-party context, I perceive no basis for affording insurers the additional protection that they would receive under the majority's holding.

For these reasons, I would reverse the summary judgment and remand for further proceedings on plaintiff's bad faith claim.